124 P.3d 943

**Jyotsna BHAKTA, Individually and as Personal Representative of the Estate of Mitesh Bhakta, Deceased; Nikhil Bhakta, a minor, by his Next Friend, Candace Turner; Dewal Shah, Individually and as Personal Representative of the Estate of Meghal Shah, Deceased; Daxa Bhakta, Individually and as Personal Representative of the Estate of Bhupendra Bhakta, Deceased; Cathy M. Arends, Individually and as Personal Representative of the Estate of Donald Arends, Deceased, Plaintiffs–Appellants,**

v.

**COUNTY OF MAUI, State of Hawai'i, Defendants–Appellees,**

and

**John Does 1–5, John Doe Corporations 1–5, John Doe Partnerships 1–5, Roe Non–Profit Corporations 1–5, and Roe Governmental Agencies 1–5, Defendants.**

No. 24780.

Supreme Court of Hawai'i.

Dec. 13, 2005.

As Amended Dec. 30, 2005.

Arnold T. Phillips II, on the briefs, for plaintiffs-appellants.

Miriam P. Loui and Marcie C.L. Laderta, Deputy Attorneys General, on the briefs, for defendant-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

This negligence action arises out of the drowning deaths of four men, Meghal Shah, Mitesh Bhakta, Bhupendra Bhakta, and Donald Arends [hereinafter, collectively, the decedents], at Ke'anae Landing on the north shore of the island of Maui, Hawai'i (between Pā'ia and Hana). On May 5, 1999, plaintiffs-appellants Dewal Shah (Dewal), Jyotsna Bhakta (Jyotsna), Daxa Bhakta (Daxa), and Cathy Arends (Cathy), the wives of the decedents [hereinafter, collectively, the widows], filed their first amended complaint, individually and as personal representatives of their respective husband's estate, and Nikhil Bhakta, the son of Mitesh Bhakta [hereinafter, the widows, the decedents' estates, and Nikhil Bhakta are collectively referred to as Plaintiffs], alleging negligence against the County of Maui (the County), the State of Hawai'i, and Doe defendants. Following a jury-waived trial, the Circuit Court of the Second Circuit, the Honorable Artemio C. Baxa presiding, entered final judgment on November 21, 2001 in favor of defendant-appellee State of Hawai'i (the State).[1]

Plaintiffs appeal from the final judgment entered in favor of the State, challenging the trial court's: (1) December 26, 2000 order denying their motion for summary judgment; and (2) November 5, 2001 findings of fact (FOF), conclusions of law (COL), and order. On appeal, Plaintiffs raise ten points of error, discussed *infra*, essentially raising issues regarding the State's duty to warn the Plaintiffs of, and failure to protect them from, the dangerous ocean and man-made conditions at Ke'anae Landing, as well as evidentiary matters. Plaintiffs challenge

---

1. By the time of trial, the State was the only remaining defendant inasmuch as the County had been previously dismissed via summary judgment.

approximately fifty of the 115 FOFs and COLs issued by the trial court.[2] For the reasons discussed below, Plaintiffs' contentions lack merit. Accordingly, we affirm the trial court's final judgment.

## I. BACKGROUND

### A. Factual Background

As explained in greater detail below, the events on January 30, 1997 leading to the drowning of the decedents began when Meghal Shah (Meghal), a tourist from Georgia, was allegedly swept into the ocean while standing at the Ke'anae Landing area. Besides the individuals who were with him [hereinafter, the Georgia Group], other individuals passing by on the highway [hereinafter, the Utah group] and local residents living nearby congregated at the landing area to help.

#### 1. Ke'anae Landing

The State owns the land upon which Ke'anae Landing is located. Originally constructed around 1917, Ke'anae Landing consisted of a wooden pier and was once a commercial wharf, but the pier was destroyed during a tidal wave in 1946.

Today, Ke'anae Landing, considered a historical site, consists of an upper landing area with concrete stairs descending approximately six feet to a lower concrete landing area at the edge of the ocean. The upper landing area is constructed atop the natural lava rock coastline, approximately six feet above sea level. A small, unmarked, and unpaved dirt area is located adjacent to the upper landing area where vehicles can pull off the road and park. According to the trial testimony, surfers and divers now use Ke'anae Landing as an access to the ocean and, periodically, small boats are launched from the landing area.

#### 2. The Georgia Group

On the afternoon of January 30, 1997 (at a little after 2:00 p.m.), married couples Meghal and Dewal,[3] Mitesh Bhakta (Mitesh) and Jyotsna, Bhupendra (Bhupendra) Bhakta and Daxa [hereinafter, collectively, the Georgia group] arrived at Ke'anae Landing. They were residents of Georgia, vacationing in Hawai'i, and had been sightseeing at various locations on Maui before arriving at Ke'anae Landing. They parked their van in the dirt area adjacent to the upper landing area, exited the vehicle, and took several photographs of the ocean and the landing area.

Meghal then walked down a concrete pathway leading to the upper landing area; Dewal followed him. Meghal asked Dewal to take a picture of him while he stood in front of a pylon or boat tie structure located on the pathway. Meghal then walked down the stairs leading to the lower landing area. Dewal began to follow him, but turned and ran back to the pathway after some water splashed on her. When Dewal looked back towards the lower landing area, she could no longer see Meghal. Subsequently, Dewal went down the pathway and stopped, whereupon she saw Meghal in the water and told the rest of the Georgia group.[4] At that point, Mitesh and Bhupendra went down to the lower platform to assist Meghal as he attempted to swim back onto the landing area. As Mitesh and Bhupendra were trying to help Meghal, the water pulled Meghal away from the landing area. At some point, Mitesh jumped into the water. When Mitesh reached Meghal, he grabbed Meghal on one side and started pulling Meghal toward the lower platform. At that point, Daxa went

---

2. It should be noted that, although Plaintiffs dispute many of the trial court's FOFs as being contrary to the evidence, they failed to raise some of these FOFs in their statement of points of error. Their contentions with respect to the latter FOFs are, therefore, waived. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded[.]").

3. Dewal subsequently remarried in 1999 and is now Dewal Shah Patel.

4. The trial court found, which Plaintiffs dispute, that "[i]t is unknown how Meghal Shah entered the water." Plaintiffs assert that they proved Meghal was swept into the ocean by a wave. However, the State mentions that Dewal testified that she did not recall how Meghal got into the ocean, whether the waves swept him in, whether he jumped in, or whether he slipped into the ocean.

down to the lower platform to give Bhupendra some rope that she had found. Dewal then saw Bhupendra throw the rope to Mitesh, who was able to grab onto it. Once Dewal saw Mitesh and Bhupendra pulling Meghal, who, by that time, was not responding, she headed away from the landing area.

### 3. The Utah Group

While Mitesh and Bhupendra were helping Meghal, Jyotsna and Daxa headed away from Ke'anae Landing in search of assistance. Daxa flagged down a van passing on the highway adjacent to Ke'anae Landing that was occupied by two married couples: Donald and Cathy Arends and Billy and Pauline Crump. Following in a second van were two other married couples: C. Wayne and Carene Erickson and Stephen and Judy Kenyon. All four couples were visiting from Utah [hereinafter, collectively, the Utah group].

After parking their vans, Donald Arends (Donald), a fireman, immediately rushed to the landing area. By this time, Meghal had stopped swimming and was floating face down in the water, and Mitesh and others were pulling Meghal onto the lower platform.

### 4. The Local Residents of Maui

While members of the Utah and Georgia groups were helping Meghal, local Maui residents Harry "Bobo" Pahukoa, III (Bobo), J.D. Pahukoa (J.D.), Sam Holi (Sam), Guy Akiu (Guy), and Ben "Kimo" Morton (Kimo) were at the residence of Harry Pahukoa, II, which is located about a quarter-mile from Ke'anae Landing.[5] Sometime in the afternoon of January 30, 1997, a tour van driver came up to the Pahukoa residence, shouting for someone to call "911." Sam immediately drove to Ke'anae Landing with Kimo and J.D., arriving in less than thirty seconds, and they all proceeded to the lower platform to help bring Meghal out of the water. At this point, several members of the Georgia group, the Utah group, and the three Maui men (Sam, Kimo, and J.D.) were on the lower platform attempting to help Meghal.

Once Meghal was pulled onto the lower platform, Sam suggested that they move Meghal up to higher ground. However, at that same instant, Donald called out that he knew how to perform cardio-pulmonary resuscitation (CPR) and went down to the lower platform. As Donald began to perform CPR, a wave struck the landing area, sweeping everyone who was on or near the lower platform into the ocean, that is, Meghal, Mitesh, Bhupendra, Donald, Cathy, Billy, Sam, J.D., and Kimo.

While the above-described events were occurring, Bobo and Guy were still at the Pahukoa residence as Bobo was getting some rope and two life vests before heading to the landing area. At some point, Bobo's friend, J.J. Hueo (J.J.), also arrived at Ke'anae Landing with his surfboard. By the time Bobo, Guy, and J.J. reached the landing area, all of the nine people referred to above were in the water.

Bobo was able to pull his brother, J.D., out of the water with the rope. Bobo then jumped into the water, wearing one life vest and carrying the other. Bobo swam over to Donald and one of the Georgia men and gave them the life vests. Bobo then rescued Billy and brought him to the upper landing area where the others could hold onto him. A few minutes later, Bobo re-entered the water, taking J.J.'s surfboard, and rescued Cathy.

Unfortunately, Bobo and the other Maui residents could rescue only J.D., Billy and Cathy; Meghal, Mitesh, Bhupendra, and Donald either drowned or sustained fatal injuries from being thrown onto the rocks by the waves.

### 5. Ocean and Weather Conditions on January 30, 1997

According to the trial court's undisputed FOFs, the ocean and weather conditions on January 30, 1997 were as follows:

> 60. At 8:16 a.m. on January 30, 1997, the Maui Civil Defense Agency issued High

---

5. Bobo is a life-long resident of the Ke'anae area and was familiar with the ocean and Ke'anae Landing. Bobo and J.D. are the sons of Harry Pahukoa II. Sam, who has lived in the Ke'anae area since 1992, is the brother-in-law of Bobo and J.D. (married to their sister). Guy is the cousin of Bobo and J.D. Kimo is Bobo's friend.

Surf Advisory # 3, which stated as follows:

"Surf on west and north shores this morning will be rising 8 to 12 feet. The buoy that is northwest of Kaua'i indicates that these waves should arrive by midmorning on the western islands. Islands east of O'ahu will see waves that are slightly lower arriving this afternoon."

61. At 11:45 a.m. on January 30, 1997, the Maui Civil Defense Agency issued High Surf Advisory # 4. Instead of the usual 12 hours, High Surf Advisory # 4 was issued approximately three hours after High Surf Advisory # 3 because there was a higher surf size. High Surf Advisory # 4 cautioned as follows:

"Surf heights on the north shore of O'ahu and Kaua'i are presently 10 to 12 feet. Swells passing at Buoy 1 northwest of Kaua'i indicate that the surf should rise as high as 10 to 15 feet this afternoon on the north shored [sic] and about 6 to 10 feet on west shores. Islands east of O'ahu will see waves that are slightly lower arriving this afternoon."

62. The areas on Maui targeted by the advisories included Paia, and Ho'okipa to Hana [i.e., the Ke'anae Landing area].

63. Sandra Hue[o] had lived in Ke'anae for twenty-six [26] years. Ms. Hue[o] testified that on the morning of January 30, 1997, she went to her home on the Ke'anae Peninsula located approximately 50 to 75 feet from the Ke'anae Landing, and that the weather that morning was rainy, cloudy[,] and misty.

### B. *Procedural History*

On January 29, 1999, Jyotsna, individually and as beneficiary and legal representative of Mitesh Bhakta, and Nikhil Bhakta, a minor, by his next friend Candace Turner, filed the instant negligence action against the County and the State. On May 5, 1999, an amended complaint was filed, naming the widows, individually and as personal representatives of their respective husbands' estates, and Nikhil Bhakta, the son of Mitesh Bhakta, as plaintiffs. The amended complaint alleged that the County and the State,

on or before January 30, 1997, knew, or in the exercise of reasonable care should have known, that wave, water or other aquatic conditions of or in the Pacific Ocean adjacent to ... Ke'anae Landing, was/were potentially dangerous to visitors of the area, including [the decedents]; further, said defendants, and/or any of them, failed to adequately warn or protect plaintiffs or any of them, or others, of or from the aforesaid dangerous aquatic conditions.

On May 4, 2000, the County moved for summary judgment on the ground that it neither owned nor occupied the landing area. Neither the State nor Plaintiffs opposed the County's motion. On August 30, 2000, the trial court granted the County's motion, dismissing all claims against the County.

On October 23, 2000, Plaintiffs moved for summary judgment against the State on the bases that the State was negligent in failing to warn of and protect the Plaintiffs from the dangerous ocean and man-made conditions at Ke'anae Landing. On December 26, 2000, the trial court denied Plaintiffs' motion for summary judgment on the ground that the existence of genuine issues of material fact precluded summary judgment.

A jury-waived trial against the State commenced on July 9, 2001, which included a site inspection of Ke'anae Landing conducted by the trial court on July 16, 2001, pursuant to a stipulation of the parties. Trial was concluded on July 18, 2001.

On August 6, 2001, the State filed a motion for judgment, which the trial court granted on November 5, 2001, issuing FOFs, COLs, and an order granting judgment as to all claims and all parties in favor of the State and against Plaintiffs. In pertinent part, the trial court concluded that Act 190 (relating to public land liability immunity) relieved the State of any liability to Plaintiffs. In the alternative, the trial court concluded that the State did not have any common law duty to warn of any dangerous conditions because the extremely dangerous ocean conditions at Ke'anae Landing on January 30, 1997 were open and obvious to persons of ordinary intelligence. In support of its ruling, the trial

court entered the following relevant FOFs, which Plaintiffs dispute:

9. There was no evidence that any drownings occurred at Keʻanae Landing prior to January 30, 1997.

10. There was no evidence that the State was aware or should have been aware of any drownings or near-drownings occurring at Keʻanae Landing prior to January 30, 1997.

. . . .

17. The Court finds that the parking area adjacent to [ ] Keʻanae Landing is not a State-maintained parking lot, but a small dirt turn off where vehicles can pull off the road or make U-turns; the Court further finds that the landing and surrounding area was neither defective nor dangerous.

. . . .

64. Ms. Hue[o] testified that as she drove to her home and passed [ ] Keʻanae Landing, she noticed that the ocean conditions by the landing were rough and that the water was hitting the rocks.

65. Ms. Hue[o] further testified that she noticed that there was white water as the water hit the rocks and she could hear the waves hitting the rocks. She saw the water coming over the rock wall between the landing and Keʻanae Boat Ramp.

66. Ms. Hue[o] testified that the rough ocean conditions she observed at the landing began in the morning of January 30, 1997[,] and worsened as the day progressed.

67. Mr. [Bobo] Pahukoa testified that he is able to see the ocean from the backyard of his house at Keʻanae, and that if the waves were crashing near his home, the conditions at [ ] Keʻanae Landing would be the same.

68. According to [Bobo], on January 30, 1997, he had been working on his truck at his house and saw that the ocean conditions near his home were rough. [Bobo] testified that the rough ocean conditions existed from the morning hours and that he could hear the waves breaking and crashing upon the rocks at the landing.

69. When [Bobo] arrived at [Keʻanae] Landing, he saw that the area by the landing was wet and water was hitting it. He could hear the waves crashing when he arrived at the landing, and estimated that they were breaking at six to seven feet.

70. [Bobo] estimated that the biggest waves he saw on that day were at least 15 feet high.

71. Waves of the magnitude witnessed by [Bobo] would be extremely dangerous at [ ] Keʻanae Landing, given Dr. Mark Merrifield's testimony that a ten-foot wave could wash up on the upper landing.

72. Dr. Grigg's testimony that the people in the Utah and Georgia Groups lacked experience and understanding regarding the ocean and its sets and lulls, and therefore that the dangers were deceptive and not open and obvious to them, was refuted by the testimony of members of the Utah Group.

73. As Judy Kenyon's van approached [ ] Keʻanae Landing, she thought it was stupid for Meghal Shah to be swimming out "in that" because it seemed rough, there were lava rocks around, and it was not a good place to swim.

74. Carene Erickson wondered why Meghal Shah was swimming in the water because it almost looked like a whirlpool and there was a lot of lava rocks.

75. Wayne Erickson did not find [ ] Keʻanae Landing to be pretty or picturesque. The ocean was not calm, and there was no "glass-like sheen"; rather, it was turbulent and churning.

76. Stephen Kenyon observed the water looked quite rough as he drove the second van containing members of the Utah Group down the road on the Keʻanae Peninsula.

77. Billy Crump of the Utah Group testified that when the Utah Group arrived at the scene, the waves coming in were big and breaking off the rocks, and it was noisy.

78. Mr. Crump described the ocean conditions when he first pulled off the highway at [ ] Ke'anae Landing as follows: "It was rough. There was big waves way out there, but as far as the lava rock, yes, the waves just coming in and banging off the rocks. That's why I said to myself, why in the hell is that guy down there swimming."

79. As the Utah group was driving to Hana, Pauline Crump could see the ocean and it did not look bad. By comparison, the ocean at [ ] Ke'anae Landing looked bad. Mrs. Crump testified "it was pounding the rocks and that. You could see it."

80. As the Utah Group was driving down to the Ke'anae Peninsula, Pauline Crump said it was raining a little more than it had been earlier and you could see the waves pounding the side of the rocks.

81. Dr. Grigg's opinion that the lull time between the sets were five to ten minutes, and that the water was calm between sets, is not credible.

82. Mark Merrifield, Ph.D., the [ ] State's expert in oceanography, opined that a lull time of five to ten minutes between sets on January 30, 1997, seemed to be quite long. Moreover, Dr. Merrifield also testified that it would not have been completely calm between lull periods, which he defined as the time during which wave heights did not exceed five feet. Therefore, even if it had been ten minutes between the ten feet waves, the actual calm periods between waves would have lasted less than a minute. Dr. Merrifield opined that anywhere from 70 to 75% of the waves on January 30, 1997 were greater than four feet, and would aggressively impact the landing.

. . . .

84. Dr. Grigg conducted a dye test to determine the ocean currents at Ke'anae Landing and found there was a whirlpool effect or current. Dr. Grigg testified that this whirlpool effect would have kept Meghal Shah in that area and made it difficult for him to come to shore. Dr. Grigg testified that it was this whirlpool effect [that] caused Meghal Shah to drown.

. . . .

86. According to Dr. Grigg, if a person was walking down the landing area, that person would see the landing as it exists and that there was no guard railing. Dr. Grigg further stated that a person would also see that there was nothing to protect him or her if that person were at the bottom of the landing.

87. The evidence demonstrates that it was the extremely dangerous ocean conditions which caused the deaths of the decedents.

88. The evidence demonstrates that the extremely dangerous ocean conditions which caused the deaths of the decedents were open and obvious to persons of ordinary intelligence.

89. Even though the decedents were not from Hawai'i and from land-locked states on the continental United States, persons of ordinary intelligence, as were these decedents, would and should have known that the ocean conditions on the day of the incident were extremely dangerous.

90. In the photographs admitted . . ., churning, murky water, large wave action, and whitewash are seen next to [ ] Ke'anae Landing seconds before the tragic incident began.

. . . .

94. The Court finds that according to evidence adduced at trial, specifically evidence of the high surf and choppy wave conditions, the extremely dangerous conditions in the ocean were open and obvious to persons of ordinary intelligence on the day of the incident.

95. The testimonies of Dewal Shah Patel, Daxa Bhakta, and Jyotsna Bhakta Patel that the ocean conditions at Ke'anae Landing on January 30, 1997 were calm is not credible. In addition to photographic evidence of the open and obvious nature of the extremely dangerous wave conditions, the Court finds credible the testimony of witnesses Sandra Hue[o],

Harry "Bobo" Pahukoa, III, Sam Holi, and Billy Crump, all of whom testified that the ocean conditions at [ ] Keʻanae Landing on the day of the incident were rough.

The trial court also entered the following relevant COLs, which Plaintiffs also dispute:

99. Act 190 is the applicable law in this case, and [the] State was not required to raise it as an affirmative defense in its Answer.

. . . .

103. As set forth in the plain language of Act 190(e), [the] State does not have a duty to warn of dangerous natural conditions in the ocean on beach accesses, coastal accesses, or in areas that are not public beach parks.

104. Act 190 limits [the] State's duty to warn of dangerous natural conditions, specifically shore breaks and strong currents in the ocean, to situations when these ocean conditions occur adjacent to public beach parks operated by [the] State.

. . . .

106. Under Act 190, [the] State did not have a duty to warn Plaintiffs of dangerous natural conditions in the ocean, specifically the shore break, the strong current near the landing, and the high surf abutting [ ] Keʻanae Landing.

107. Act 190 relieves [the] State of any liability to [ ] Plaintiffs.

108. Even assuming that Act 190 did not apply in this action, [the] State did not have any common law duty to warn of the extremely dangerous natural conditions in the ocean at [ ] Keʻanae Landing that caused the deaths of the decedents.

. . . .

110. Defendant State, as owner and occupier of [ ] Keʻanae Landing, a piece of State property abutting the ocean, owed a duty to warn Plaintiffs of extremely dangerous conditions in the ocean, which were: (1) not known or obvious to persons of ordinary intelligence; and (2) in the exercise of reasonable care ought to have been known to the occupier.

111. According to the evidence adduced at trial, the extremely dangerous conditions in the ocean were open and obvious to persons of ordinary intelligence on the day of the incident.

. . . .

113. Since the danger was open and obvious, [the] State did not owe a duty to Plaintiffs to warn of the extremely dangerous condition that caused the deaths of the decedents.

114. Based upon the evidence presented, this Court finds that Plaintiffs did not meet their burden of proof to show that ordinary care was not used by [the] State.

On November 21, 2001, final judgment was entered in favor of the State. Plaintiffs timely appealed on December 19, 2001.

## II. *STANDARDS OF REVIEW*

### A. *Motion for Summary Judgment*

 This court reviews a circuit court's grant or denial of summary judgment *de novo*. *Price v. AIG Hawaiʻi Ins. Co.*, 107 Hawaiʻi 106, 110, 111 P.3d 1, 5 (2005) (citation omitted). The standard for granting a motion for summary judgment is well settled:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (brackets in original) (citation omitted). Moreover, "summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." *Miller v. Manuel*, 9 Haw.

App. 56, 65–66, 828 P.2d 286, 292 (1991) (brackets, citation and internal quotation marks omitted).

### B. Findings of Fact

 This court reviews the trial court's FOFs under the clearly erroneous standard. *Ueoka v. Szymanski*, 107 Hawai'i 386, 393, 114 P.3d 892, 899 (2005) (citations omitted).

A[n] [FOF] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A[n] [FOF] is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Bremer v. Weeks*, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (citing *Beneficial Hawai'i, Inc. v. Kida*, 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001)).

### C. Conclusions of Law

 This court reviews the trial court's COLs *de novo*. *Bremer*, 104 Hawai'i at 51, 85 P.3d at 158. "A COL is not binding upon an appellate court and is freely reviewable for its correctness." *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004) (citations and internal quotations marks omitted). Moreover, "[a] COL that is supported by the trial court's [FOFs] and that reflects an application of the correct rule of law will not be overturned." *Id.* (brackets in original) (citations and internal quotation marks omitted).

### D. Statutory Interpretation

 Statutory interpretation is reviewed *de novo* by this court. *Blair v. Ing*, 95 Hawai'i 247, 253, 21 P.3d 452, 458 (2001) (citations omitted). "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Taylor–Rice v. State*, 105 Hawai'i 104, 108, 94 P.3d 659, 663 (2004) (citations omitted).

Moreover, "[i]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." *T–Mobile USA, Inc. v. County of Hawai'i Planning Comm'n*, 106 Hawai'i 343, 352–53, 104 P.3d 930, 939–40 (2005) (citation omitted).

### E. Evidentiary Rulings

 [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. Where the evidentiary ruling at issue concerns admissibility based upon relevance, under ... [Hawai'i Rules of Evidence (HRE)] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard....

*In re Estate of Herbert*, 90 Hawai'i 443, 460, 979 P.2d 39, 56 (1999) (citations omitted) (ellipses and some brackets in original) (some brackets added). However, "[e]videntiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Id.* (citation and quotation marks omitted).

 "[T]he extent of cross-examination is a matter largely within the discretion of the trial court and will not be the subject of reversal unless clearly prejudicial to the complaining party." *Kekua v. Kaiser Found. Hosp.*, 61 Haw. 208, 221, 601 P.2d 364, 373 (1979) (citations omitted).

 It is well-settled that the "admissibility of expert testimony is reviewed for abuse of discretion." *Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (quoting *Craft v. Peebles*, 78 Hawai'i 287, 301, 893 P.2d 138, 152 (1995)) (internal quotation marks omitted). The appellant bears the burden of showing that the trial court's decision "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice

to the substantial detriment of a party litigant." *Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 101, 73 P.3d 46, 55 (2003) (citations and internal quotation marks omitted).

## III. *DISCUSSION*

### A. *Denial of Motion for Summary Judgment*

Plaintiffs sought summary judgment with respect to: (1) their claims that the State was negligent in failing to warn and protect them against the dangerous conditions at Ke'anae Landing; (2) the widows' claims of negligent infliction of emotional distress; and (3) the loss of consortium claims of the widows and Mitesh's son, Nikhil Bhakta. On appeal, Plaintiffs contend that the trial court erred in denying their motion.

 The State argues that, under the "*Morgan* rule," the trial court's denial of Plaintiffs' motion for summary judgment, which was based on its finding that genuine issues of material fact existed, is not reviewable on appeal. The *Morgan* rule was adopted by this court in *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 837 P.2d 1273 (1992). Therein, this court stated:

> At an early stage in the development of the motion for summary judgment, **the rule developed that an order denying the motion could not be appealed if denial was based on the presence of factual questions for the jury, but could be appealed if based on questions of law.** J. Rothschild, *Simplification of Civil Practice in New York: A Review of Judicial Experience Under the Civil Practice Act,* 23 Col. L.Rev. 618, 648 (1923). This rule seems to explain the holding in *Morgan v. American University,* 534 A.2d 323 (D.C.App.1987), the case upon which plaintiff relies for its assertion that denials of summary judgments are unreviewable. In *Morgan,* the court reasoned that where summary judgment was denied because of the existence of issues of fact and the case was subsequently decided by the jury, reversal on appeal would allow a decision based on less evidence, to prevail over one reached on more. *Id.* at 326. Significantly, however, the court also ruled that any

legal rulings made by the trial court at summary judgment <u>could</u> be reviewed on appeal. *Id.* at 327.

*Id.* at 17–18, 837 P.2d at 1282–83 (underscored emphases in original) (bold emphasis added). In *Larsen,* the defendant appealed the trial court's denial of its motion for summary judgment on the plaintiffs' implied warranty claim. *Id.* at 17, 837 P.2d at 1282. The defendant's appeal of the denial came after a jury trial on the merits in favor of the plaintiffs. *Id.* This court noted that it was "clear from the record that the issue argued and decided on summary judgment—whether the defect asserted by plaintiff was actionable—was a question of law." *Id.* at 18, 837 P.2d at 1283. Thus, this court held that the defendant was entitled to a review of the trial court's denial of its motion for summary judgment. *Id.*

In *Gump v. Walmart Stores, Inc.,* 93 Hawai'i 428, 5 P.3d 418 (App.1999), *aff'd in part and rev'd in part on other grounds,* 93 Hawai'i 417, 5 P.3d 407 (2000), the Intermediate Court of Appeals (ICA) applied the dual framework established by *Larsen, i.e.,* "that a denial of summary judgment based on the presence of factual issues is not reviewable, while a denial based on questions of law is." *Id.* at 437, 5 P.3d at 427 (citation omitted). In applying the dual framework, the ICA stated:

> The order denying [defendant's] motion for summary judgment as to the negligence claim is reticent as to the reasons underlying the trial court's decision. No findings of fact or conclusions of law were filed thereon, and none were required. Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a).
>
> The transcript of the hearing on the motion provides, however, some inkling as to the basis of the court's denial. A perusal of the transcript reveals two possible, but mutually exclusive bases: (1) that what constitutes constructive notice of the specific instrumentality of the accident (the french fry, in this case) is always a matter of fact for the jury, and (2) that what constitutes constructive notice is an issue involving Wal–Mart's general mode of operation, in and of itself and without pri-

mary reference to the specific instrumentality of the accident.

As to the first basis, the court queried:

Isn't that to be left to the fact finder if that's reasonable? What if your client noticed every hour of every day, would you say that we still had no notice because we inspected at the end of the day. Whether that's reasonable or not, shouldn't that be left to the fact finder?

As to the second basis, the court stated:

If the possessor should have known of the unreasonable risk ... and impose a duty to the person using the land to take reasonable steps to eliminate the unreasonable risks. The argument is if the person knows or should have known that food items would be taken out on the floor and shouldn't this be a factual question to determine whether the land owner, in this case McDonald's, took reasonable steps to eliminate this unreasonable risk?

Because the court denied summary judgment on the negligence claims based upon an issue or issues of law, distilled from the transcript and enumerated above, we are permitted, under *Larsen,* to review the denial.

*Gump,* 93 Hawai'i at 437–38, 5 P.3d at 427–28 (ellipses in original). *Larsen's* dual framework is in line with the majority of federal and state jurisdictions. *See Lum v. City & County of Honolulu,* 963 F.2d 1167, 1170 n. 1 (9th Cir.1992) (adhering "to the majority view that in the ordinary case where a motion for summary judgment has been denied because the trial court determined that issues of fact had to be tried, there is no useful purpose in reviewing the pretrial ruling on summary judgment after a plenary trial on the merits"); *Evans v. Jensen,* 103 Idaho 937, 655 P.2d 454 (App.1982) (holding that it is the general rule that an order denying a motion for summary judgment is not reviewable on appeal from a final judgment; any legal rulings made by the trial court affecting that final judgment can be reviewed at that time in light of the full record); *Kiesau v. Bantz,* 686 N.W.2d 164 (Iowa 2004) (holding that after a full trial on the merits, a previous order denying a motion for summary judgment is no longer reviewable).

In the present case, the order denying Plaintiffs' motion for summary judgment stated that the motion was denied "because there [were] genuine issues of material fact." In their memorandum in support of their motion, Plaintiffs contended that they were entitled to summary judgment because there was no dispute that: (1) the landing site was dangerous; (2) the State had a duty to either remove the dangerous conditions or warn of them; and (3) the State neither removed the dangerous conditions or warned of them, in breach of its duty. In response, the State argued that summary judgment was improper because it had no duty to warn inasmuch as: (1) Ke'anae Landing was not a state beach park; and (2) the conditions relating to the landing site were known or obvious. The State also maintained that the question regarding causation, *i.e.,* whether the conditions of the landing site or the ocean caused the incident, was for the jury, not the court, to determine. The transcript of the hearing on the motion sheds light as to the basis of the trial court's denial of Plaintiffs' motion. The trial court stated:

[I]f [Act 190] says the State owes a duty to exercise reasonable care and warn park users about dangerous conditions which are not known or reasonably discoverable by persons of ordinary intelligence, but the State is not liable for dangerous conditions under its control, if as you say this is dangerous, then *is there not a* material dispute here as to whether—*genuine issue of material fact here as to whether the dangerous conditions of Ke'anae Landing [are] not known or obvious to persons of ordinary intelligence.* At least, I think there should be, even basically from your own submissions, but you, yourself, characterize it as dangerous.

. . . .

Based upon those—the first one I mentioned, at least from what the Court can conclude, *there are genuine issues of material fact, so the court is going to deny the motion.*

(Emphases added.) Inasmuch as the trial court denied summary judgment based upon the existence of a genuine issue of material fact, we hold that Plaintiffs are not entitled

to a review of the denial of their motion for summary judgment.

## B. *Act 190*

Act 190, entitled "A Bill for an Act Relating to Public Land Liability Immunity," was enacted in 1996. 1996 Haw. Sess. L. Act 190, at 434–37. The purpose of the legislation was to "establish a process in which the State and counties can provide both meaningful and legally adequate warnings to the public regarding extremely dangerous natural conditions in the ocean adjacent to public beach parks." *Id.*, § 1 at 434–35. Act 190 took effect on July 1, 1996, and was to be repealed on June 30, 1999. *Id.*, § 7 at 437. The repeal date was later extended from June 30, 1999, to June 30, 2007. *See* 1999 Haw. Sess. L. Act 101, § 2 at 370; 2002 Haw. Sess. L. Act 170, § 2 at 610.

Section two of Act 190 provides in pertinent part:

(a) The State or county operating a public beach park shall have a duty to warn the public specifically of dangerous shorebreak or strong current in the ocean adjacent to a public beach park if these conditions are extremely dangerous, typical for the specific beach, and if they pose a risk of serious injury or death.

. . . .

(e) Neither the State nor a county shall have a duty to warn on beach accesses, coastal accesses, or in areas that are not public beach parks of dangerous natural conditions in the ocean.

(f) Neither the State nor any county shall have a duty to warn of dangerous natural conditions in the ocean other than as provided in this section.

1996 Haw. Sess. L. Act 190, § 2(a), (e), and (f) at 435.

### 1. The Trial Court's Conclusion that Act 190 is not an Affirmative Defense

With respect to the Plaintiffs' contention that the State was required to affirmatively declare its reliance on Act 190 in its answer to the complaint, the trial court concluded:

99. Act 190 is the applicable law in this case, and Defendant State was not required to raise it as an affirmative defense in its Answer.

. . . .

101. . . . [E]ven assuming that Defendant State was required to raise Act 190 as an affirmative defense in its Answer, under Rule 15(b) of the Hawaiʻi Rules of Civil Procedure, Defendant State's failure to so plead was immaterial because the issue was tried by the express or implied consent of the parties.

In challenging the aforementioned COLs on appeal, Plaintiffs maintain that Act 190 is an affirmative defense and argue that, because the State failed to raise Act 190 in its answer to the complaint, the State's reliance on the act is untimely. In response, the State alleges that Plaintiffs' arguments must be rejected because the State first raised the applicability of Act 190 in opposition to Plaintiffs' motion for summary judgment, filed October 23, 2000, and that, therefore, there was no prejudice to Plaintiffs by the State's filing of its motion for judgment on the basis of Act 190.

Act 190 establishes the State's duty to warn of dangerous natural conditions in the ocean. Duty is the first of the four well-established elements of a claim for relief founded on negligence; to wit:

(1) *A duty* or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

(2) [a] failure on the defendant's part to conform to the standard required: a breach of the duty;

(3) [a] reasonably close causal connection between the conduct and the resulting injury; and

(4) [a]ctual loss or damage resulting to the interests of another.

*Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Hawaiʻi 34, 68, 58 P.3d 545, 579 (2002) (quoting *Dairy Road Partners v. Island Ins. Co.*, 92 Hawaiʻi 398, 419, 992 P.2d 93, 114 (2000)) (emphasis added).

As discussed more fully *infra*, Act 190 establishes that the State (1) has a duty

to warn of dangerous conditions in the ocean adjacent to a public beach, but (2) has no duty to warn of dangerous natural ocean conditions on beach accesses, coastal accesses, or in other areas that are not public beach parks. In the context of this case, Act 190 essentially negates an element of Plaintiffs' negligence action, *i.e.*, duty. "A defense is not affirmative where it 'merely negates an element of the plaintiff's prima facie case.'" *Hadar v. Concordia Yacht Builders, Inc.*, 886 F.Supp. 1082, 1089 (S.D.N.Y.1995) (quoting *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1408 (10th Cir.1988)). In other words, "[b]ecause the alleged lack of duty would merely negate an element of the plaintiff's claim, it is not appropriately considered an affirmative defense." *Etienne v. Wal–Mart Stores, Inc.*, 197 F.R.D. 217, 221 (D.Conn.2000); *see also Vroegh v. J & M Forklift*, 165 Ill.2d 523, 209 Ill.Dec. 193, 651 N.E.2d 121, 126 (1995) ("The absence of duty is not an affirmative defense. It attacks the legal sufficiency of the plaintiff's claim. Rather than giving color to the cause of action, it negates one of the action's basic elements." (Citation omitted.)).

Moreover, "lack of duty" is not one of the enumerated defenses required to be affirmatively pled pursuant to HRCP Rule 8(c); [6] nor does the "defense" of lack of duty fall under the residual clause of Rule 8(c), which includes as an affirmative defense "any other matter constituting an avoidance or affirmative defense." HRCP Rule 8(c). Plaintiffs' argument is, therefore, without merit. Accordingly, we hold that COL No. 99 is correct. Consequently, the validity of COL No. 101 need not be addressed inasmuch as it was rendered on the assumption that Act 190 is an affirmative defense.

### 2. Applicability of Act 190

■ Plaintiffs challenge the following three COLs made by the trial court regarding the applicability of Act 190:

103. As set forth in the plain language of Act 190(e), Defendant State does not have a duty to warn of dangerous natural conditions in the ocean on beach accesses, coastal accesses, or in areas that are not public beach parks.

104. Act 190 limits Defendant State's duty to warn of dangerous natural conditions, specifically shore breaks and strong currents in the ocean, to situations when these ocean conditions occur adjacent to public beach parks operated by Defendant State.

. . . .

106. Under Act 190, Defendant State did not have a duty to warn Plaintiffs of dangerous natural conditions in the ocean, specifically the shore break, the strong current near the landing, and the high surf abutting the Ke'anae Landing.

Plaintiffs allege that these COLs are wrong because the language of Act 190 § 2(e) is not plain, but ambiguous in scope. Alternatively, they argue that, assuming *arguendo* that the language is plain, it does not apply in the present case. The State counters that "Act 190 unequivocally relieves the State of any duty to warn of dangerous natural conditions in the ocean in areas that are not public beach parks," and, even assuming *arguendo* that Act 190 is ambiguous, any distinctions between natural and man-made structures was not intended by the legislature to be included in Act 190.

As previously stated, section 2 of Act 190 states:

(a) The State or county *operating a public beach park* shall have a duty to warn the public specifically of dangerous shorebreak or strong current in the ocean adjacent to a public beach park if these conditions are extremely dangerous, typical for the specific beach, and if they pose a risk of serious injury or death.

. . . .

(e) Neither the State nor a county shall have a duty to warn on *beach accesses,*

---

6. HRCP Rule 8(c) provides in pertinent part:

In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

coastal accesses, or in areas that are not public beach parks of dangerous natural conditions in the ocean.

(f) Neither the State nor any county shall have a duty to warn of dangerous natural conditions in the ocean other than as provided in this section.

1996 Haw. Sess. L., Act 190 § 2 at 435 (emphases added).

Based on the plain language of the act, section 2(a) applies solely to "public beach parks." Plaintiffs and the State agreed that Keʻanae Landing is *not* a public beach park and that Keʻanae Landing does not fall under the jurisdiction of the Division of State Parks. To the extent COL No. 104 tracks the language in section 2(a), COL No. 104 reflects the correct rule of law and, thus, should not be overturned.

 Plaintiffs next argue that section 2(e) does not apply because "ocean conditions were not the sole danger to Plaintiffs and the decedents; the conditions of Keʻanae Landing itself were dangerous, which are not dangerous natural conditions in the ocean."

Section 2(e) of Act 190 plainly states that the State (and counties) shall not have a duty to warn of "dangerous natural conditions in the ocean" at "beach accesses, coastal accesses, or in areas that are not public beach parks." Plaintiffs, however, maintain that section 2(e) is ambiguous in scope because it is unclear to what extent section 2(e) abrogates the "*Littleton* rule" and the "*Richardson* rule" with respect to the State.

 In *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 833 P.2d 70 (1992), this court reaffirmed the rule enunciated in *Littleton v. State*, 66 Haw. 55, 656 P.2d 1336 (1982), with respect to the State's common law duties as the owner and occupier of the ocean water. As this court explained in *Birmingham*, the *Littleton* rule is that the State,

> as the owner and occupier of the ocean water and all the beach area up to the high water mark adjacent to a municipal beach park, does not owe a duty to persons injured as a result of water-related activities, unless the "facts are similar to *Asato [v. Matsuda,* 55 Haw. 334, 519 P.2d 1240

(1974)], or analogous thereto." To determine whether there are facts similar to *Asato*, the court must determine: (1) whether the condition causing the injury was a dangerous *unnatural* condition in the area of the water-related activity; and (2) whether the State had actual or constructive knowledge of the condition. If the court determines both that a dangerous *unnatural* condition existed and that the State had actual or constructive knowledge of the condition, then the State has a duty to warn of the condition by taking whatever measures, if any, are reasonably available to rectify and prevent the condition.

*Birmingham*, 73 Haw. at 378, 833 P.2d at 80 (emphases in original). Generally, under the *Littleton* rule, a duty to warn would arise only if (1) a dangerous *unnatural* condition caused the injury at issue and (2) the State had actual or constructive notice of the condition. Whereas the *Littleton* rule addresses *unnatural* conditions in the ocean, Act 190, § 2(e) addresses *natural* conditions in the ocean. Thus, the *Littleton* rule is inapplicable in the context of the instant case. It is undisputed that the ocean waves were a cause of the decedents' deaths. As this court has previously stated, "[a] wave is a naturally occurring phenomenon of the ocean," and, by its very nature, it "cannot be an *unnatural* condition." *Id.* at 379, 833 P.2d at 80.

 The *Richardson* rule, which is set forth in *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawaiʻi 494, 880 P.2d 169 (1994), arises from this court's decision in *Corbett v. AOAO of Wailua Bayview Apartments*, 70 Haw. 415, 772 P.2d 693 (1989). In *Corbett*, this court announced the following rule with respect to landowner liability:

> [I]f a condition exists upon the land which poses an unreasonable risk of harm to persons using the land, then the possessor of the land, if the possessor knows, or should have known of the unreasonable risk, owes a duty to the persons using the land to take reasonable steps to eliminate the unreasonable risk, or adequately to warn the users against it.

*Corbett,* 70 Haw. at 417, 772 P.2d at 693. Under the State Tort Liability Act, the State is liable "in the same manner and to the same extent as a private individual under like circumstances." Hawai'i Revised Statutes (HRS) § 662–2 (1993). Thus, under the *Richardson* rule, the State, as a landowner, owes a duty to exercise reasonable care when (1) a condition poses an unreasonable risk of harm and (2) the State knows or should know of the unreasonable risk. If both prerequisites are met, then the State's duty is to (1) take reasonable steps to eliminate the unreasonable risk or (2) adequately warn users against the risk.

As previously indicated, the State owns the land upon which Ke'anae Landing is located. Moreover, Section 2(e) of Act 190 imposes no duty upon the State to warn of dangerous natural ocean conditions at "beach accesses, *coastal accesses,* or in areas that are not public beach parks." (Emphasis added.) By arguing in their opening brief that, "[h]ad the State not constructed a pathway and a stairway leading to a platform at the ocean's edge, there would be no *access to the ocean* at this location" (emphasis added), Plaintiffs essentially concede that Ke'anae Landing constitutes a "coastal access." Inasmuch as Act 190 controls, we reject Plaintiffs' arguments with respect to the *Littleton* and *Richardson* rules. Accordingly, we hold that the trial court correctly concluded that Act 190 relieves the State of any duty to warn Plaintiffs of any dangerous ocean conditions at the Ke'anae landing area.

3. **The Trial Court's Conclusion that Act 190 Relieves the State of Any Duty to Warn of the "Extremely Dangerous" Ocean Conditions at Ke'anae Landing**

On appeal, Plaintiffs agree with the trial court's numerous FOFs and COLs that the ocean conditions at Ke'anae Landing on January 30, 1997, were "extremely dangerous." Plaintiffs, however, argue that COL No. 110 is contrary to Hawai'i law. Specifically, Plaintiffs contend that:

> Defendant State, as owner and occupier of [ ] Ke'anae Landing, a piece of State property abutting the ocean, owed a duty to warn Plaintiffs of extremely dangerous conditions in the ocean, which were: (1) not known or obvious to persons of ordinary intelligence; and (2) in the exercise of reasonable care ought to have been known to the occupier.

Plaintiffs claim that this court, in *Friedrich v. Department of Transportation,* 60 Haw. 32, 586 P.2d 1037 (1978), held that "landowners—government landowners in particular—have a duty to warn of or protect against open and obvious dangers that are extremely dangerous." The State argues that the common law principles relied upon by Plaintiffs were preempted in Hawai'i by the enactment of Act 190.

As a preliminary matter, we note that Plaintiffs have misstated the holding in *Friedrich. Friedrich* merely states that,

> [w]here the government maintains land upon which the public are invited and entitled to enter, it may reasonably assume that members of the public will not be harmed by known or obvious dangers which are not extreme, and which any reasonable person exercising ordinary attention, perception, and intelligence could be expected to avoid.

*Id.* at 36–37, 586 P.2d at 1040 (citation and internal quotation marks omitted). Although *Friedrich* did not decide whether Hawai'i law imposes a duty to warn of obvious but extreme dangers, this court in *Kaczmarczyk v. City and County of Honolulu,* 65 Haw. 612, 656 P.2d 89 (1982), held that an occupier of land fronting the shoreline of the ocean has

> a duty to warn users ... of extremely dangerous conditions in the ocean along its beach frontage which were not known or obvious to persons of ordinary intelligence, and which were known or in the exercise of reasonable care ought to have been known to the [occupier].

*Id.* at 615, 656 P.2d at 92. COL No. 110 appears to track this court's holding in *Kaczmarczyk.*

Act 190 imposes a similar limited duty to warn of ocean conditions that are extremely dangerous. As previously stated, section 2(a) of Act 190 provides:

The State or county operating a public beach park shall have a duty to warn the public specifically of dangerous shorebreak or strong current in the ocean adjacent to a public beach park *if these conditions are extremely dangerous,* typical for the specific beach, and if they pose a risk of serious injury or death.

1996 Haw. Sess. L. Act 190, § 2(a) at 435 (emphasis added). Under the plain language of section 2(a), the State is required to warn of "extremely dangerous" ocean conditions (1) that occur at *public beach parks,* (2) if these conditions are typical for the specific beach, and (3) if they present a risk of serious injury or death. In the present case, inasmuch as Ke'anae Landing is not a public beach park, the State did *not* have a duty to warn of any "extremely dangerous" ocean conditions at Ke'anae Landing. Moreover, in promulgating Act 190, the legislature expressly provided that the State and counties are not subject to any other duty to warn of dangerous natural ocean conditions, *"other than as provided in [Act 190.]"* 1996 Haw. Sess. L. Act 190, § 2(f) at 435 (emphasis added). Thus, Plaintiffs' argument that the State has a common law duty to warn of "extremely dangerous" ocean conditions at Ke'anae Landing is without merit. To the extent that *Friedrich* and *Kaczmarczyk* may be read as conflicting with the legislature's decision to limit the State and counties' duty to warn of "extremely dangerous conditions" at only public beach parks, we believe that *Friedrich* and *Kaczmarczyk* are superseded by Act 190. Accordingly, we hold that the State, as the owner and occupier of Ke'anae Landing and its surrounding ocean water, did not owe a duty to Plaintiffs to warn them of the extremely dangerous ocean conditions at Ke'anae Landing.

### 4. The Trial Court's Findings and Conclusions that the Ocean Conditions at Ke'anae Landing Were Open and Obviously Dangerous

The trial court made numerous FOFs and COLs regarding the rough, open, and obvious ocean conditions at Ke'anae Landing. With respect to these FOFs and COLs, Plaintiffs essentially argue that the evidence clearly shows

that Plaintiffs arrived at Ke'anae Landing during a lull period, in which there were no waves and the ocean appeared relatively calm. Thus, even if there were openly and obviously rough waves at Ke'anae Landing at any other time during the day, Plaintiffs did not see them.

However, as stated earlier, Act 190 supersedes *Kaczmarczyk's* holding with respect to the State and counties' duty to warn users of extremely dangerous conditions in the ocean along its beach frontage (1) which were not known or obvious to persons of ordinary intelligence, and (2) which were known or in the exercise of reasonable care ought to have been known to the State or county. Inasmuch as Act 190 eliminates the need to determine whether ocean conditions were not known or obvious to persons of ordinary intelligence, the trial court's FOFs and COLs with respect to the open and obvious nature of the ocean conditions were unnecessary, but nevertheless not clearly erroneous or wrong.

### 5. The Trial Court's Findings with respect to Prior Drowning Incidents Occurring at Ke'anae Landing Prior to January 30, 1997

Plaintiffs allege that the trial court impliedly found that the State did not have notice of any dangerous conditions at Ke'anae Landing, based on FOF Nos. 9 and 10, which state:

9. There was no evidence that any drownings occurred at Ke'anae Landing prior to January 30, 1997.

10. There was no evidence that the State was aware or should have been aware of any drownings or near-drownings occurring at Ke'anae Landing prior to January 30, 1997.

On appeal, Plaintiffs assert that they

were not required to prove that the State had any notice of the dangers at Ke'anae Landing because *the State created those very dangers.* Even if they were required to prove notice, they were not required to prove actual notice. Plaintiffs proved that the State had constructive notice of the dangers at the landing because the State

knew how the public used the landing and *it knew that the ocean conditions there were hazardous;* therefore, the State should have maintained the site to make it reasonably safe for its intended use. Last, the State had constructive notice that [there] were prior drownings at Keʻanae Landing, and even if it did not, it needed to have constructive knowledge only of the dangers at the site, not of whether the exact same injury had occurred there before.

(Emphases added.) Although Plaintiffs argue that the State "created the *dangerous conditions* that caused the events of January 30, 1997" (emphasis added), they fail to define exactly what "dangerous conditions" the State had created. The only conditions mentioned by Plaintiffs in their challenge to FOF Nos. 9 and 10 are the "ocean conditions." However, Plaintiffs surely could not have intended to assert that the State somehow created the hazardous ocean conditions. It appears that Plaintiffs may be attempting to argue that the man-made conditions at Keʻanae Landing, *i.e.,* the concrete platform areas and stairway, were dangerous. Such argument is similar to their contentions regarding the risks associated with the landing area itself. *See* discussion *infra.*

Because section 2(e) of Act 190 does not impose any duty on the State to warn of dangerous natural conditions in the ocean at coastal accesses, beach accesses, or in areas that are not public beach parks, the trial court's FOF Nos. 9 and 10 were unnecessary, but nevertheless not clearly erroneous.

### C. *The Alleged Dangers Associated with the Landing Area Itself*

**1. Plaintiffs' Claim that the State had a Duty to Warn of the Conditions Associated with the Landing Area Itself**

██ Plaintiffs submit that, under the *Richardson* rule, the State, as the owner and occupier of Keʻanae Landing, had a duty to

Plaintiffs to take reasonable steps to eliminate unreasonable risks or warn them against the risks associated with the landing area itself. The State argues that, if,

as Plaintiffs urge, Act 190 is interpreted such that it does not apply to the present case because Keʻanae Landing was a contributing factor, the statute would be inapplicable under almost any situation. Significantly, under Plaintiffs' proposed interpretation, it could be argued in almost any situation involving a drowning that the natural ocean conditions were not the sole proximate cause, but that a beach or ocean access was a contributing factor, and that Act 190 therefore should not apply.

In response, Plaintiffs assert that "[t]he court was ... required to bifurcate the State's duties between the duty to warn of dangerous natural conditions in the ocean[ ] and the duty to warn of or protect against the dangers of Keʻanae Landing itself. Act 190 protects the State only against the former."

The trial court specifically found in FOF No. 17 that "the landing and surrounding area was neither defective nor dangerous."[7] Plaintiffs assert that FOF No. 17 is: (1) contrary to FOF No. 86 and (2) contrary to the substantial evidence in the record. FOF No. 86 states:

According to Dr. Grigg, if a person was walking down the landing area, that person would see the landing as it exists and that there was no guard railing. Dr. Grigg further stated that a person would also see that there was nothing to protect him or her if that person were at the bottom of the landing.

Plaintiffs submit that, "[t]o the extent that FOF 86 implies that the dangerous conditions at Keʻanae Landing were open and obvious, it is contrary to FOF 17." Plaintiffs also argue that they presented evidence at trial that there were dangerous conditions at

---

7. FOF No. 17 states, in its entirety:

The Court finds that the parking area adjacent to [ ] Keʻanae Landing is not a State-maintained parking lot, but a small dirt turn off where vehicles can pull off the road or make

U-turns; the Court further finds that *the landing and surrounding area was neither defective nor dangerous.*
(Emphasis added.)

the landing area itself and that the State failed to eliminate those risks:

> Dr. Richard Grigg testified that if the State did not wish to erect warning signs, it could eliminate the risks of waves sweeping over the lower platform by restricting access thereto or removing the structures. Both Mr. [Herbert] Bogert and Mr. [Patrick] Durkin [Plaintiffs' expert witnesses] testified as to how Keʻanae Landing is dangerous and what the State could do to eliminate those dangers, such as railings, barriers, cables, and demolition.... [T]he State intended for Meghal to use the landing just as he was; however, such use was dangerous to him and others. The State had superior knowledge of this danger, yet it did nothing to eliminate the risk, although it could have easily done so.

(Citations to record omitted.)

The State asserts, *inter alia*, that "there was substantial contradictory evidence, including but not limited to the court's own site inspection conducted pursuant to [ ] Plaintiffs' request."[8] Plaintiffs' challenge to FOF No. 17 is without merit.

As this court has noted, even where testimony as to particular facts is uncontradicted, "questions of fact always involve a question of credibility to be resolved by the trier of facts." *Siko v. Seguirant,* 51 Haw. 118, 119, 452 P.2d 447, 448 (1969). This court must, therefore, "generally accept the determination of the court which had the opportunity to observe the demeanor of the witnesses during the direct and cross-examinations." *Id.* at 119–20, 452 P.2d at 448. Moreover, the admissibility and weight to be given to expert testimony dealing directly with an ultimate question which the trial court, as the trier of fact, was required to decide is ordinarily left to the discretion of the trial court. *Friedrich,* 60 Haw. at 38, 586 P.2d at 1041. This court's analysis in *Friedrich* is particularly illuminating:

> We need not consider what limitations may exist on the freedom of a trier of fact to reject uncontradicted expert testimony. Here the testimony offered by [plaintiff-appellant] went only to the question whether a guardrail or a warning sign was necessary to make the pier reasonably safe for sightseers. The opinion of [plaintiff-appellant]'s experts on this issue dealt directly with an ultimate question which the trial court was required to decide as the trier of fact. We have said that such testimony is ordinarily inadmissible and in any event its admission is largely within the discretion of the trial court. *Sherry v. Asing,* 56 Haw. 135, 147–48, 531 P.2d 648, 657–58 (1975). Although the testimony was admitted by the trial court, the weight to be accorded to it was clearly to be determined by the court. We conclude that [plaintiff-appellant]'s challenges to the findings of fact are without merit.

*Id.* at 38, 586 P.2d at 1041.

Likewise, in the present case, the trial court, as the trier of fact, was faced with the question whether railings, barriers, cables, and/or demolition of the landing were necessary to make Keʻanae Landing reasonably safe for visitors. Implicit in the trial court's finding that the "landing and surrounding area was neither defective nor dangerous" is the trial court's apparent belief that any remedial modifications to the landing area, including demolition, were not necessary. The trial court's finding is premised upon its own viewing of Keʻanae Landing and several pictures exhibiting the conditions of the landing area seconds before Meghal was seen in the ocean. Accordingly, there is substantial evidence to support the trial court's finding that the landing area was neither defective nor dangerous. *See State v. Pauline,* 100 Hawaiʻi 356, 375, 60 P.3d 306, 325 (2002) (holding that a jury view, whether by a jury or a judge as the trier of fact, constitutes independent evidence). Thus, we hold that the trial court's finding that the landing area was neither defective nor dangerous was not clearly erroneous.

---

8. The State also mentions that the deposition testimony of Plaintiffs' expert, Herbert Bogert, cannot be considered by the trial court because his deposition was never received into evidence. Although the index to the record of appeal shows that Bogert's deposition was not admitted into evidence, a form affixed to Bogert's deposition itself states that his deposition was admitted into evidence on August 3, 2001, by the clerk of the trial court.

218

### 2. Plaintiffs' Claim Alleging the Failure of the State to Protect Plaintiffs Against the Alleged Dangers of the Landing Area Itself

■ On appeal, Plaintiffs argue that FOF No. 3 is erroneous. FOF No. 3 states in relevant part: "Plaintiffs filed their First Amended Complaint against Defendant State on May 6, 1999, alleging that Defendant State had a duty to warn of dangerous ocean conditions at [ ] Ke'anae Landing." Plaintiffs contend that this finding is erroneous "to the extent that it disregards Plaintiffs' claim that the State failed to protect them from the dangers at Ke'anae Landing." Plaintiffs argue that they asserted claims for *both* the State's failure to warn of unreasonable risks *and* its failure to eliminate those risks, and, as a result, the trial court failed to enter any FOF or COL with respect to Plaintiffs' "failure to eliminate risks" claim. Thus, Plaintiffs submit that the trial court erred when it entered final judgment as to *all* claims in favor of the State.

In response, the State argues that Plaintiffs failed to prove that the landing area itself was unreasonably dangerous. Based on the analysis provided *supra*, we agree.

The allegation in Plaintiff's amended complaint at issue here specifically stated:

[O]n or before January 30, 1997, knew, or in the exercise of reasonable care should have known, that wave, water or other aquatic conditions of or in the Pacific Ocean adjacent to ... Ke'anae Landing, was/were potentially dangerous to visitors of the area, including [the decedents]; further, said defendants, and/or any of them, *failed to adequately warn or protect plaintiffs or any of them, or others, of or from the aforesaid dangerous aquatic conditions.*

(Emphasis added.) Plaintiffs, on appeal, incorrectly characterize the claims they alleged in their complaint. Plaintiffs' complaint alleged that the defendants failed to adequately protect plaintiffs from the "aforesaid dangerous *aquatic* conditions." (Emphasis added.) Inasmuch as "aquatic" means "living or growing in water," Plaintiffs actually alleged that the defendants failed to protect them from water-related conditions, not the man-made conditions of the landing area itself, as they argue on appeal. The Random House College Dictionary 67 (1st ed.1979).

Additionally, the trial court concluded that "Act 190 relieves the Defendant State of any liability to Plaintiffs." COL No. 107. On appeal, Plaintiffs argue that, although Act 190 *does* relieve the State of its duty to warn Plaintiffs, it *does not* relieve the State of its "alternate duty under common law premises liability 'to take reasonable steps to eliminate the unreasonable risk.' " However, the landing area itself was found to be neither defective nor dangerous, and, as discussed *supra*, such finding was supported by substantial evidence.

Consequently, we hold that FOF No. 3 is not clearly erroneous and that COL No. 107 is correct.

### D. *The Trial Court's Findings and Conclusions with respect to Causation*

Plaintiffs maintain that FOF Nos. 84 and 87 and COL Nos. 108 and 113 are erroneous and/or wrong because the trial court did not consider the "undisputed evidence that Ke'anae Landing contributed to the decedents' deaths." Essentially, the trial court concluded that it was the "extremely dangerous ocean conditions which caused the deaths of the decedents." Plaintiffs argue that the trial court's findings and conclusions are "contrary to Hawai'i law on causation." In support, Plaintiffs assert that: (1) but for the unnatural landing area, "Meghal would not have been standing where a wave could sweep him out into the ocean"; and (2) "one cannot see the lower platform at Ke'anae Landing until he ... moves almost all the way down the pathway.... Thus, anyone who has never visited the site would not know that the lower platform exists, and would not know that a wave could sweep over it, unless he ... is on or near the lower platform at such a discreet moment in time." Plaintiffs submit that, because Ke'anae Landing itself "was a substantial factor contributing to Meghal's death," Act 190, § 2(e) does not apply to the instant case.

In response, the State contends that Plaintiffs raise "irrelevant arguments on the issue of causation." The State also argues that Plaintiffs have no evidentiary support for their assertion that the landing area itself was dangerous. As previously discussed, the State, as the owner and occupier of Keʻanae Landing and its surrounding waters, did not owe any duty to Plaintiffs. We, therefore, need not reach the issue of causation inasmuch as Plaintiffs have failed to meet one the four essential elements of negligence, *i.e.*, duty. *See Takayama v. Kaiser Found. Hosp.*, 82 Hawaiʻi 486, 498–99, 923 P.2d 903, 915–16 (1996) (stating that in order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages).

### E. *Various Other Findings Made by The Trial Court*

Finally, Plaintiffs argue that the trial court made numerous other erroneous FOFs. As discussed below, their contentions are without merit.

First, Plaintiffs allege that FOF Nos. 21, 22, 24, and 25 are erroneous because these findings rely on Exhibit S–7, which was never admitted into evidence. Plaintiffs' argument is without merit. The trial court's exhibit list clearly indicates that Exhibit S–7 was admitted into evidence on July 17, 2001, at 10:02 a.m.

■ Second, Plaintiffs challenge FOF No. 35, which states: "It is unknown how Meghal Shah entered the water." Plaintiffs allege that this finding is erroneous because "the State never disputed Plaintiffs' assertion that a wave swept Meghal into the ocean." The State maintains that not only did Plaintiffs not prove that a wave swept Meghal into the ocean, Dewal (Meghal's wife) testified that she was unsure how Meghal entered the water:

Q: [By defense counsel]: [W]hen you turned around, Meghal was gone?

A: [By Dewal Shah]: Yeah. He was on the—he was down there.

Q: Excuse me. What I am referring to is after the splash, and you turned—and you turned your back, Meghal was already gone?

A: Well, I didn't see him.

. . . .

Q: You later learned he had—he was in the water? You learned later?

A: Yes.

Q: *And you don't recall how he got there, whether the waves swept him in, whether he jumped in, whether he slipped in? You don't know?*

A: *No.*

(Emphases added.) Based on Dewal's testimony, there is substantial evidence to support the trial court's finding that it was unclear how Meghal entered the water. *See In re Jane Doe, Born on June 20, 1995*, 95 Hawaiʻi 183, 196–97, 20 P.3d 616, 629–30 (2001) (noting that testimony of a single witness, if found credible by the trier of fact, suffices as substantial evidence to support an FOF).

Third, Plaintiffs claim that FOF No. 26 is erroneous because there is no evidence in the record to support it. FOF No. 26 provides in pertinent part: "The Georgia Group then stopped at the Keʻanae Arboretum, where . . . Meghal Shah spontaneously dove into a foreign pool and invited the others to join him; no one did. The Keʻanae Arboretum is located just a few minutes from [ ] Keʻanae Landing." It is unclear from the record whether Meghal did dive into a pool at Keʻanae Arboretum. However, even if the trial court's finding is found to be clearly erroneous, Plaintiffs fail to argue how this finding, if erroneous, affected the outcome of the trial court's decision. *See* HRS § 641–2 (1993) ("No judgment, order or decree shall be reversed, amended or modified for any error or defect unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant."); *Torres v. Torres*, 100 Hawaiʻi 397, 412, 60 P.3d 798, 813 (2002) (noting that in order for a court's erroneous finding to constitute reversible error, appellant must indicate how the erroneous finding affected the outcome of the trial court's decision).

And, lastly, Plaintiffs dispute two FOFs with respect to Bobo's testimony. FOF Nos. 68 and 70 provide:

68. According to [Bobo], on January 30, 1997, he had been working on his truck and saw that the ocean conditions near his home were rough. [Bobo] testified that the rough ocean conditions existed from the morning hours and that he could hear the waves breaking and crashing upon the rocks at the landing.

 . . . .

70. [Bobo] estimated that the biggest waves he saw on that day were at least 15 feet high.

Plaintiffs contend that there is no evidence in the record to support these FOFs. Again, even assuming these findings are clearly erroneous, Plaintiffs fail to demonstrate how these findings affected the outcome of the trial court's decision. *See* HRS § 641–2; *Torres,* 100 Hawai'i at 412, 60 P.3d at 813.

F. *Plaintiffs' Remaining Contentions*

Plaintiffs contend that: (1) they were not allowed to introduce evidence of the State's admissions that Ke'anae Landing is dangerous; (2) they were not allowed to fully cross-examine the State's witnesses; and (3) the State's oceanography expert was allowed to testify as to ocean conditions at Ke'anae Landing on January 30, 1997, when such testimony went beyond the scope of the expert's pretrial expert report. Having concluded that the State did not owe any duty to Plaintiffs, we need not address Plaintiffs' remaining evidentiary contentions.

IV. *CONCLUSION*

Based on the foregoing, we affirm the trial court's November 21, 2001 final judgment in favor of the State.

