308 P.3d 891

**Heather R. WINFREY, Individually and as Personal Representative for the Estate of Jasmine Rose Anne Fry, and Samuel J. Fry, Jr., Petitioners/Plaintiffs–Appellants,**

v.

**GGP ALA MOANA LLC dba Ala Moana Center, Respondent/Defendant–Appellee.**

No. SCWC–30589.

Supreme Court of Hawai'i.

July 18, 2013.

Michael J. Green, Glenn H. Uesugi, and Myles S. Breiner, Honolulu, for petitioner.

Patricia M. Napier, Thomas Benedict, and Kimberly A. Vossman, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., and Circuit Judge TRADER, Assigned by Reason of Vacancy; With ACOBA, J., Concurring and Dissenting Separately.

Opinion of the Court by McKENNA, J.

### I. Introduction

Jasmine Rose Anne Fry ("Fry") somehow accessed the rooftop of Ala Moana Center ("Center"), entered into and became trapped in an exhaust duct above the Makai Market Food Court ("Food Court"), then died from hyperthermia and respiratory compromise. Her parents, Heather R. Winfrey and Samuel J. Fry, Jr. (collectively, "Plaintiffs"), sued GGP Ala Moana LLC dba Ala Moana Center ("Ala Moana"). Before a trial date had been set, Ala Moana moved for summary judgment on the grounds that (1) it did not owe Fry a duty of care because she was a trespasser; and (2) it could not be held liable for its affirmative attempts to render aid. The Circuit Court of the First Circuit ("circuit court") granted summary judgment in favor of Ala Moana on all of Plaintiffs' claims.[1] The Intermediate Court of Appeals ("ICA") affirmed on appeal, concluding that Ala Moana did not owe Fry a legal duty under any theory of liability.

We hold that summary judgment was properly granted on Plaintiffs' general prem-

1. The Honorable Gary W.B. Chang presided.

ises liability claims against Ala Moana as a possessor of land because: (1) Ala Moana owed no duty to a person not reasonably anticipated to be on the rooftop and, based on the admissible evidence, Fry could not have reasonably been anticipated to be on the rooftop; (2) even if Ala Moana should have reasonably anticipated Fry's presence on the rooftop, it still could not be held liable because Fry's entry into the exhaust vent was not reasonably foreseeable; therefore, any breach of its general duty as a possessor of land was not a substantial factor in causing Fry's injuries and/or death; (3) whether or not Fry had the mental capacity to voluntarily enter the exhaust duct is irrelevant to Ala Moana's general premises liability duty; (4) the doctrine of *res ipsa loquitur* is inapplicable; and (5) Plaintiffs' other theories as to how Fry ended up on the rooftop are speculative and constitute intentional torts for which Ala Moana cannot be held vicariously liable.

We also hold, however, that pursuant to section 338 of the Restatement (Second) of Torts, adopted by this court in *Farrior v. Payton*, 57 Haw. 620, 562 P.2d 779 (1977), as a possessor of land in immediate control of the heat, smoke, and gasses emanating from stoves in the Food Court into the exhaust duct, and knowing of Fry's presence in dangerous proximity to those forces, Ala Moana had a duty to exercise reasonable care to control those forces to prevent them from doing harm to Fry, even if she was a trespasser. Genuine issues of material fact exist as to (1) whether Ala Moana breached its duty under section 338; and (2) if so, whether such breach was a substantial factor in causing Fry's injuries and/or death.

In addition, we hold that, pursuant to section 314A(3) of the Restatement (Second) of Torts, as a possessor of land who held its land open to the public, Ala Moana had a duty to members of the public who entered the Center in response to its invitation to take reasonable action to give first aid after

it knew or had reason to know that such persons were ill or injured, and to care for such persons until they could be cared for by others. Genuine issues of material fact exist to (1) whether Fry was a member of the public who entered the Center in response to Ala Moana's invitation; (2) if so, whether Ala Moana breached its duties under section 314A(3); and (3) if so, whether such breach was a substantial factor in causing Fry's injuries and/or death.

Therefore, we vacate in part and affirm in part the ICA's judgment in favor of Ala Moana, and remand the case to the circuit court for further proceedings consistent with this opinion.

## II. Background

### A. Factual Background

Reviewing the law *de novo* and the facts and in the light most favorable to Plaintiffs, pursuant to the standards governing appellate review of summary judgment motions,[2] the following factual background can be gleaned from the evidence in the record.[3]

On Saturday, September 3, 2005, at around five or ten minutes after 2:00 p.m., Cary Oshiro ("Oshiro"), a maintenance worker employed by Ala Moana, responded to a call from the Poi Bowl restaurant at the Food Court indicating its exhaust fan was not working. Oshiro was at Poi Bowl for less than a minute. While there, security officers were also responding to a smoke alarm at Little Café Siam, next door. Because the two restaurants shared the same exhaust vent, Oshiro proceeded to the rooftop to determine whether the exhaust fan was functioning.

Before proceeding to the Bally rooftop, where these ducts eventually ended, Oshiro called the security control center to explain that he would be accessing a secured gate to the stairwell.[4] He then used an electronic

2. See Section III, *infra*.

3. _____ Ala Moana's former counsel had initially filed a motion for summary judgment. Substitute counsel withdrew this motion without prejudice, then later filed a revised motion. Portions of this factual background are contained in

submissions from the withdrawn motion for summary judgment.

4. According to Ala Moana's unwritten policies and procedures, employees were required to call the control center before accessing any of the

swipe card to open the gate and proceeded upstairs.[5] Normally, the magnetic lock on the gate was wired to a silent alarm system that would signal whether the gate was open or closed, and the lock was monitored in the security control center. That afternoon, however, the alarm for the gate was not functioning properly, and there was no video surveillance of the area. Ala Moana's security and maintenance personnel were the only people with access to these areas and, during the relevant time period, no keys or access cards had been reported lost or stolen.[6]

Oshiro proceeded to unlock a padlock on the hatch that opened onto the rooftop. When he reached the rooftop, he checked the exhaust fan and determined that it was not running. A young woman, later identified as Fry, appeared from behind the fan. Fry was barefoot, dressed in shorts and a tank top, and had grease smeared on her feet, hands, hair and face. She did not appear to have any noticeable injuries.

Oshiro asked Fry what she was doing on the rooftop, and she responded that she was a contractor hired to clean grease from the fan. When Oshiro asked whether security knew she was working on the rooftop, she said, "Yes." When he asked who had contracted her to do the work, Fry responded, "A guy named Joe." These answers struck Oshiro as odd because that type of work typically was not done during business hours, when the restaurants needed the exhaust fans. Oshiro then asked how she had gotten onto the rooftop, but Fry did not answer. He repeated the question two or three times, and she responded, "No, it doesn't matter." Oshiro noticed that Fry was jumpy and seemed nervous.

One to three minutes after first encountering Fry on the rooftop, Oshiro called security

to verify her story. As he did, Fry climbed on top of the exhaust duct and began jumping up and down. Oshiro asked her what she was doing, but she did not respond. He then asked her to come down, and she climbed off the duct.

Charles (or Kazu) Yokoyama ("Yokoyama"), a senior maintenance mechanic, joined Oshiro on the rooftop, and Oshiro explained the situation to him. In the meantime, Fry had climbed back onto and started jumping forcefully on the duct. Yokoyama asked her to come down and talk to them, but Fry did not respond. As Fry continued jumping, Yokoyama stepped away to call security.

Fry then told Oshiro that there was a baby in the duct. Oshiro asked her what she was talking about, and Fry responded, "No, nothing. You know, it doesn't matter." At this point, two to five minutes had passed since Oshiro first encountered Fry. Eventually, the force of Fry's jumping caused the sheet metal to collapse inward, creating a hole about six to eight inches high and two feet wide. Fry slid her feet inside the opening and squeezed into the duct as the metal bent under her weight. Upon witnessing this, Oshiro again called security, and asked that a security officer be sent to the roof.

In the meantime, Derek Hangai ("Hangai"), in the security control center, checked Ala Moana's records to determine whether any contractors had been scheduled to work on the rooftop. As he confirmed with the Poi Bowl and Little Café Siam that neither restaurant was aware of any work scheduled that day, Oshiro called to report that Fry had climbed into the exhaust duct. Hangai stated he did not remember whether he asked Lieutenant Henry Tancayo ("Tancayo") or dispatcher Brian Babauta ("Babauta") if he should call emergency services

rooftops or other secured areas of the Center. On one occasion, over ten years ago, an employee forgot to call security before accessing one of the magnetic locks and the alarm went off.

5. The metal gate leading to the stairwell could be opened by either a Matco security key or a swipe card, both of which were individually numbered or coded so that the owner could be identified if a key were lost. If a swipe card were used, certain data would be recorded including the identity of the card holder and time of access. If

a traditional key were used, no data would be recorded.

6. When Ala Moana personnel or contractors accessed the rooftop, they would leave the gate slightly ajar until they completed their work, and they would again call security once they left the area and closed the gate. Additionally, the padlock on the hatch would be left open when contractors or personnel were working on the roof.

upon learning that Fry had climbed into the duct.

Ala Moana security officer Lukela Bagood ("Bagood") arrived on the rooftop just as Fry was entering the exhaust duct. Bagood had been instructed by his supervisor, Tancayo, to arrest or detain Fry if possible. Bagood relayed to Tancayo that Fry was inside the duct, but he did not recall whether anyone asked if they should call emergency services. Security officer Jowana Lobendahn ("Lobendahn") responded later, at approximately 2:35 p.m. Lobendahn stuck her head into an opening in the duct and attempted to locate Fry. Lobendahn asked Fry if she was injured, and Fry responded "No." Lobendahn then continued to communicate with Fry and told her to stay where she was, but Fry stopped responding. After two or three minutes, however, Oshiro and Yokoyama heard a loud banging from inside the duct, followed by silence.

In an attempt to locate Fry, Lobendahn, Yokoyama, and Oshiro followed the route of the ventilation duct inside the building. Lobendahn went one level down to the Gucci corridor, where she kicked and banged on the duct to see if Fry could hear her. She then returned to the rooftop to see if Bagood could get Fry to respond. Yokoyama ran downstairs to the parking lot level. Oshiro ran to the Food Court where the duct eventually ended. Bagood and Lobendahn remained on the Bally rooftop for around twenty minutes until the control center directed them to Little Café Siam.

When Oshiro arrived at Little Café Siam, the employees reported that the exhaust duct above the stove was moving. Oshiro saw that someone was pushing at the sheet metal from the inside. After unscrewing the access panel to the duct and opening up the sheet metal, Oshiro noticed that Fry was trapped in a small space in the stove hood, on the other side of a narrow metal bar. Fry was responsive and said something, but Oshiro could not recall what she said. Oshiro could not recall what time he arrived at the restaurant.

Although Oshiro and Yokoyama said that the stoves were off when they arrived at Little Café Siam, Lobendahn, who arrived later, stated:

> One stove ewa of where the female was located had [four] pots with hot water. [Second] stove directly under the female had [two] large cooking woks that had nothing in it. We had the employees of Café Siam remove cooking items out of the way and turned off all stoves and gasses.

In addition, according to Bagood, the stoves and ovens at Poi Bowl were still on when he arrived downstairs.

After restaurant employees were directed to turn off the stoves, Lobendahn pulled down a metal panel underneath Fry so she could get some air, and held her hand in an attempt to reassure her and keep her conscious. Lobendahn asked Fry for her name, age, where she was from, and why she was on the rooftop. Fry responded that her name was Dallas, she was twenty-two years old, and she was from Kona. She said that she had been on the rooftop because she wanted to be free. She also said that she had a miscarriage, but did not want to talk about it because it made her cry. Fry later said that she was sorry, she did not want to die, and please get her out. Lobendahn reassured her that everything was going to be okay and they would get her out.

When patrons were injured, Ala Moana's procedure was to have security call emergency services, which would arrive on scene within a few minutes. Bagood was therefore surprised that when he arrived at the Food Court, emergency service personnel were not already there. In fact, no one from Ala Moana called emergency services until 2:54 p.m.; and when the call was made, it was to inform the Honolulu Police Department ("HPD") that a woman had broken into a duct at Ala Moana Center and was crawling through the duct without authorization. HPD was asked to send an officer to the rooftop in case the woman decided to climb out of the duct. Moments later, however, HPD was informed that the woman was attempting to crawl down the duct into the Food Court, and Ala Moana asked that the officer report to Little Café Siam.

At approximately 2:57 p.m., security personnel called Emergency Medical Services

("EMS") to request an ambulance, and to report that an unknown female had gotten into the exhaust fans on the rooftop and had either slipped or fallen down the duct. Security reported that maintenance was attempting to remove the woman from the exhaust duct. EMS called the Honolulu Fire Department ("HFD") to request assistance in extricating Fry from the duct. As EMS was explaining the situation to HFD, an Ala Moana security officer said, "Oh, looks like we got her out," and then, "You know what ambulance would be good for now. It looks like she's okay, but—. . . ." According to the transcript of this call, Ala Moana security could hear what EMS was relaying to HFD. When EMS told HFD that it was no longer needed because Fry had been removed from the exhaust duct, the security officer did not correct EMS to request that HFD or EMS respond to the scene immediately.

At approximately 3:00 p.m., another call was placed from Ala Moana security, this time directly to HFD, requesting assistance in extricating Fry from the duct. Paramedics arrived on the scene at 3:06 p.m., and HFD arrived at 3:10 p.m. Once EMS, HPD, and HFD arrived, Oshiro, Yokoyama, and Lobendahn stepped away as rescue services personnel attempted to extricate Fry from the duct. Fry was finally removed from the exhaust duct at approximately 4:53 p.m. Upon removal from the duct, she immediately became unresponsive, and was transported to The Queen's Medical Center in critical condition at 5:09 p.m. Fry was asystolic during transport to the hospital, and resuscitation efforts failed. She arrived at the hospital at 5:28 p.m., and was pronounced dead at 5:33 p.m.

An autopsy performed on Fry indicated that the cause of death was the combined effects of hyperthermia and respiratory compromise. Fry was twenty-two years old at the time of her death, and was approximately six to eight weeks pregnant. The autopsy indicated that no internal injuries caused or contributed to Fry's death, although the extrication process left various scrapes and bruises on her skin. In addition, blisters on her skin were consistent with superficial burns from contact with a hot surface. The

medical examiner concluded that information regarding the circumstances leading to and surrounding her death suggested an acute psychotic episode of unknown etiology. No stimulant drugs known to cause an acute psychotic episode were detected in Fry's blood or vitreous fluid.

A subsequent investigation by HPD and Ala Moana could not conclusively determine the means by which Fry accessed the Bally rooftop. Upon further examination of the rooftop that afternoon, Fry's belongings, including her ID, toiletries, clothes, perfume, day planner, and purse, were found scattered in three drains on the rooftop. Among the items found was a screwdriver.

Ala Moana personnel did not know of any unauthorized entry or trespass to the rooftop or the ventilation system before this incident. They also did not know how Fry could have gotten to the rooftop other than through the secured gate and hatch. Other evidence indicated, however, that it was possible to access the Bally rooftop from an adjacent building. In response to an interrogatory asking how Fry got to the rooftop, Ala Moana surmised that Fry likely entered areas that were marked for authorized personnel only and climbed on the Center's rooftop until she reached the Bally rooftop by (a) entering a fourth floor hallway near the Godiva store that led to a rooftop door, which was propped open by air conditioning contractors, then traversing the rooftops to the Bally rooftop, or (b) entering a fourth floor hallway that led to a ledge that allowed her to access the rooftop directly across from the Bally rooftop, then climbing across the Neiman Marcus tiled rooftop over to the Bally rooftop.

## B. Circuit Court Proceedings

Plaintiffs Heather R. Winfrey, individually and as personal representative for Fry's estate, and Samuel J. Fry, Jr. filed suit against Ala Moana in the Circuit Court of the First Circuit. Plaintiffs asserted claims against Ala Moana for: wrongful death (Count I); negligent failure to provide a safe premises (Count II); negligent failure (a) to properly train or supervise employees, and (b) to care for Fry and her unborn child during the

incident (Count III); intentional/negligent infliction of emotional distress (Count IV); and punitive damages (Count V).

Before discovery had been completed and before a trial date had been set, Ala Moana filed the subject motion for summary judgment, arguing, in general, that (1) it did not owe Fry a legal duty because she was a trespasser not reasonably anticipated to be on the Bally rooftop, and (2) it could not be held liable for its attempts to aid Fry after she became stuck in the exhaust duct. Specifically, Ala Moana asserted that there could be no liability arising from its ownership of the property because Fry had been a trespasser, she was not reasonably anticipated to be in a secure area to which only authorized personnel had access, the limited duty owed to trespassers did not apply where there had been no prior history of trespass to the area, and it did not create or maintain the condition that harmed Fry. Ala Moana further argued that it did not have an affirmative duty to intervene to protect Fry from her own actions. Finally, it argued that it could not be held liable for any attempts to aid Fry because the duty to assist an injured person was limited and any attempts to render aid were protected by a Good Samaritan statute, Hawai'i Revised Statutes ("HRS") § 663–1.5.

In opposition, Plaintiffs argued that Ala Moana had implicitly taken custody of Fry because Ala Moana personnel had exclusive control over and access to the rooftop. They claimed that Fry was induced to the rooftop and locked outside by an Ala Moana employee, and that she was suffering from the effects of heat stroke when maintenance and security personnel found her. Plaintiffs argued that Ala Moana had a duty to use reasonable care for the safety of all persons reasonably anticipated on the premises. In addition, they contended that Ala Moana voluntarily undertook to ensure the safety of its customers, and the reasonableness of its ac-

tions in rendering aid was a question of fact. They also argued that the doctrine of *res ipsa loquitur* applied because Fry could not have been locked on the rooftop but for Ala Moana's negligence. Finally, they argued that the circuit court had erred in denying their request for a continuance to conduct additional discovery, including various depositions.[7]

Ala Moana replied, inter alia, that the evidence established that Fry was a trespasser, and that any allegation that she was locked on the rooftop by an Ala Moana employee relied on pure conjecture rather than reasonable inferences. It claimed that Plaintiffs' characterization of the facts distorted the evidence in the record. It reiterated that Ala Moana did not owe a duty based on premises liability because Fry was not reasonably anticipated to be on the rooftop, and that Plaintiffs' other theories of liability were without merit where there was no evidence Ala Moana allowed Fry to access the rooftop and Fry voluntarily broke into the exhaust duct.

After a hearing on this motion, the circuit court orally granted summary judgment in favor of Ala Moana on all claims based on premises liability and intentional conduct. The court declined to grant summary judgment on any remaining claims based on a duty to render aid. It noted that, pursuant to *Lundy v. Adamar of New Jersey*, 34 F.3d 1173 (3d Cir.1994), a landowner has a duty to render aid once it becomes aware of a person injured on its property. The court stated that this duty might have required Ala Moana to take affirmative action upon learning of Fry's presence on the rooftop, and it declined to shield Ala Moana from liability through HRS § 663–1.5, a Good Samaritan statute which generally precludes civil liability against a person rendering first aid.

The circuit court entered an order granting summary judgment in favor of Ala Moa-

---

7. In opposing Ala Moana's motion for summary judgment, Plaintiffs explained that they had been unable to depose all of the relevant individuals involved in the incident—including security officers who responded to the incident or dispatched emergency services from the control center, the ranking administrator who answered Plaintiffs' interrogatories, and Ala Moana's Chief of Securi-

ty. Before the ICA, Plaintiffs again raised the issue of incomplete discovery. Plaintiffs do not specifically raise this issue in their application for writ of certiorari; based on the analysis below, incomplete discovery is relevant to some but not other issues arising from Plaintiffs' theories of liability.

na on Count II (negligence in failing to provide a safe premises) and part of Count IV (intentional infliction of emotional distress). However, it denied summary judgment on Count I (wrongful death), Count III (negligence in failing to properly train/supervise employees or otherwise care for Fry), part of Count IV (negligent infliction of emotional distress), and Count V (punitive damages).

In the meantime, Ala Moana filed a motion for reconsideration, arguing that Plaintiffs' remaining claims should be dismissed pursuant to *Moyle v. Y & Y Hyup Shin Corp.*, 118 Hawai'i 385, 191 P.3d 1062 (2008). Ala Moana argued that, based on *Moyle*, it could not be held liable for its affirmative attempts to render aid absent a showing of gross negligence or wanton acts or omissions. Plaintiffs, however, argued that *Moyle* was distinguishable because it involved an incident occurring outside the defendant's premises, a criminal act by a third party, and a failure to act by defendant's employees.

Upon considering these arguments, the circuit court entered an order granting summary judgment in favor of Ala Moana on the remaining counts pursuant to *Moyle*. The court then entered final judgment in favor of Ala Moana on all of Plaintiffs' claims.

## C. The ICA Decision

On appeal, Plaintiffs and Ala Moana essentially repeated their arguments to the circuit court. In a summary disposition order ("SDO"), the ICA affirmed the circuit court's final judgment in favor of Ala Moana. The ICA concluded, in relevant part, that Ala Moana did not take Fry into custody based on Plaintiffs' unsupported allegations that Ala Moana employees were responsible for bringing Fry to the rooftop; Ala Moana did not owe a duty of care under a general premises liability theory because the rooftop was secured by a set of locked doors, Fry was not authorized to be on the rooftop, and Plaintiffs produced no evidence that Ala Moana should have reasonably anticipated her presence on the rooftop; Ala Moana did not voluntarily assume a duty of care for Fry's safety; there was no duty to render aid because there was no special relationship

between Ala Moana and Fry; and the doctrine of *res ipsa loquitur* was inapplicable where Fry's death was caused by her own voluntarily actions in entering the exhaust duct against the warnings of Ala Moana employees. In addition, the ICA concluded that the parties' arguments regarding *Moyle* were moot because summary judgment could be affirmed based on the absence of a duty to render aid under *Lee v. Corregedore*, 83 Hawai'i 154, 925 P.2d 324 (1996).

## D. Issues on Certiorari

Plaintiffs argue to this court that, viewing the facts in the light most favorable to them, the ICA gravely erred in affirming summary judgment because there were genuine issues of material fact as to whether Fry acted voluntarily when she entered the exhaust duct and whether she was reasonably anticipated to be on the rooftop. They argue that the ICA erred in dismissing their theory of *res ipsa loquitur* because the facts supported an inference that Fry would not have been on the rooftop but for Ala Moana's negligence. Finally, Plaintiffs argue that the ICA erred in concluding that Ala Moana did not owe Fry a special-relationship duty to protect or warn against dangers, which it knew or should have known posed a substantial risk of harm and over which it exercised immediate control.

Ala Moana, on the other hand, contends that Plaintiffs' legal theories are grounded in baseless assumptions rather than admissible facts. It argues that the ICA properly concluded that Fry was not authorized to be on the rooftop, that she voluntarily entered the exhaust duct, and that her presence could not have been reasonably anticipated by Ala Moana. Ala Moana also maintains that it did not owe a duty of care under a theory of general premises liability; there was no special relationship which would trigger a duty to render aid; and the duty to protect against forces over which a possessor of land is in immediate control was inapplicable.

## III. Standard of Review

A motion for summary judgment is reviewed de novo, under the same standard applied by the trial court. *State v. Trade-*

*winds Elec. Serv. & Contracting,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995). *See* Hawai'i Rules of Civil Procedure ("HRCP") Rule 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pacific Int'l Serv. Corp. v. Hurip,* 76 Hawai'i 209, 213, 873 P.2d 88, 92 (1994) (citation omitted). A fact is material if proof of that fact would have the effect of establishing or refuting an essential element of a cause of action asserted by one of the parties. *Guajardo v. AIG Hawai'i Ins. Co.,* 118 Hawai'i 196, 201, 187 P.3d 580, 585 (2008).

On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *First Ins. Co. of Hawai'i v. Sariaslani,* 80 Hawai'i 491, 494, 911 P.2d 126, 129 (1996). "[T]he court is permitted to draw only those inferences of which the evidence is reasonably susceptible and it may not resort to speculation." *Pioneer Mill Co. v. Dow,* 90 Hawai'i 289, 295, 978 P.2d 727, 733 (1999) (citation omitted).

The burden lies upon the moving party to show that no genuine issue of material fact exists with respect to the essential elements of the claim and that, based on the undisputed facts, he is entitled to judgment as a matter of law. *Sariaslani,* 80 Hawai'i at 493, 911 P.2d at 128. Only once the moving party has satisfied its initial burden of production does the burden shift to the non-moving party to show specific facts that present a genuine issue for trial. *Id.*

When a summary judgment motion is filed before the discovery deadline, a HRCP Rule 56(f) continuance provides the means by which a non-moving party can assure that she has had adequate time to conduct discovery before the motion is decided. *Ralston v. Yim,* 129 Hawai'i 46, 63, 292 P.3d 1276, 1293 (2013).

## IV. Discussion

A negligence action lies only where there is a duty owed by the defendant to the plaintiff. *Birmingham v. Fodor's Travel Publ'ns,* 73 Haw. 359, 366, 833 P.2d 70, 74 (1992). The existence of a duty is a question of law, which this court reviews de novo. *Id.*

In recognizing the existence of a duty, this court is guided by several basic principles:

First, the existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant—is entirely a question of law. Second, whether a duty exists is a question of fairness that involves a weighing of the nature of the risk, and the public interest in the proposed solution. Third, we will not impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society.

*Hao v. Campbell Estate,* 76 Hawai'i 77, 80, 869 P.2d 216, 219 (1994) (citations, internal quotation marks, and brackets omitted).

### A. General Premises Liability Claim

An occupier of land has a duty to use reasonable care for the safety of all persons reasonably anticipated to be on the premises, regardless of the status of the individual as invitee, licensee, or trespasser. *Pickard v. City & Cnty. of Honolulu,* 51 Haw. 134, 135, 452 P.2d 445, 446 (1969) (remanding for new trial based on duty owed to visitor to courthouse, who used restroom with broken light switch and fell through a hole in the floor). *See also Gibo v. City & Cnty. of Honolulu,* 51 Haw. 299, 301, 459 P.2d 198, 200 (1969) (holding that hospital had a duty to maintain premises in a reasonably safe condition for plaintiff who entered through ambulance garage rather than main entrance).[8]

---

8. Other jurisdictions have similarly recognized that landowners owe a duty to exercise care for the safety of persons reasonably anticipated on their premises. *See, e.g., Stewart v. DuPlessis,* 42

For the following reasons, Ala Moana was entitled to summary judgment on Plaintiffs' general premises liability claim.

█ First, based on the evidence adduced, Fry could not have been reasonably anticipated to be on the rooftop. Even if Ala Moana's interrogatory answer as to how Fry reached the rooftop is considered, there had been no other unauthorized entries onto the rooftop; therefore, Fry's presence on the Bally rooftop could not have been reasonably anticipated.

█ Second, even if there were factual issues as to whether Ala Moana should have reasonably anticipated Fry's presence on the rooftop, Plaintiffs would not be able to prevail on a general premises liability claim because the requisite causation would not exist. In this regard, it is well-established that the elements of a negligence claim are:

1. A duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

2. A failure on the defendant's part to conform to the standard required: a breach of the duty;

3. A reasonably close causal connection between the conduct and the resulting injury[;] and

4. Actual loss or damage resulting to the interests of another.

*Knodle v. Waikiki Gateway Hotel,* 69 Haw. 376, 384–85, 742 P.2d 377, 383 (1987) (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 30, at 164–65 (5th ed. 1984))

(brackets and ellipses omitted). In other words, even if (1) and (2) were established, there would be no "reasonably close causal connection between" Ala Moana's alleged breach of duty in creating a condition that allowed Fry access to the rooftop and her subsequent injuries and/or death, because the existence of the exhaust duct on the rooftop did not create a unreasonable risk of harm, and because Fry's forced entry therein was not reasonably foreseeable. Therefore, the requisite causation element could not be met as a matter of law.

Third, although Plaintiffs argue that questions of fact exist as to whether Fry "voluntarily" entered the exhaust duct in light of her mental capacity at the time of the incident, any such questions of fact are irrelevant to whether Ala Moana breached its general duty as an occupier of land. Again, even if Ala Moana could have reasonably anticipated Fry's entry into the rooftop area, it could not have "reasonably" anticipated Fry's entry into the exhaust duct.

█ Fourth, contrary to Plaintiffs' assertion, the doctrine of *res ipsa loquitur* does not create an inference of negligence under the circumstances of this case. *Res ipsa loquitur* permits an inference of negligence when the thing that produced a person's injury is under the control and management of the defendant, and the injury could not have occurred in the ordinary course of events but for the defendant's failure to exercise due care. *Carlos v. MTL,* 77 Hawai'i 269, 277, 883 P.2d 691, 699 (App.1994) (citing *Turner v. Willis,* 59 Haw. 319, 324–25, 582 P.2d 710, 714 (1978)).[9] Where an accident

Ill.App.2d 192, 191 N.E.2d 622, 625–26 (1963) (holding that contractor had duty to exercise ordinary care to avoid injury where the facts indicated that children were reasonably anticipated on construction site); *Duxworth v. Pat Caffey Contractor,* 209 So.2d 497, 500 (La.Ct.App. 1968) (holding that contractor could be held liable for negligence where he left heavy trailer unsecured in street even though foreman knew that children played on the trailer); *L.A.C. v. Ward Parkway Shopping Ctr. Co.,* 75 S.W.3d 247, 257–58 (Mo.2002) (en banc) (holding that owners and managers of mall had a duty to take reasonable care to protect business invitees where reports of prior incidents against female victims indicated that criminal activity alleged by plaintiff was foreseeable). *But see Craig v. Bailey*

*Bros. Realty,* 304 Ga.App. 794, 697 S.E.2d 888, 893–94 (2010) (holding that child was not anticipated trespasser on owner's property, railroad crossties did not constitute attractive nuisance, and owners therefore were not liable on premises liability claim); *Pride v. Cleveland State Univ.,* 73 Ohio Misc.2d 45, 657 N.E.2d 878, 881 (Ohio Ct.Cl.1995) (holding that university, which did not know of hazardous condition in ventilation shaft until after plaintiff was injured, did not breach duty of reasonable care).

9. This court has explained the rationale of the doctrine as follows: [T]he doctrine of *res ipsa loquitur* asserts that whenever a thing that produced an injury is shown to have been under the control and management of the de-

could have occurred in the normal course without negligence, or where two equally plausible inferences can be drawn as to whether the accident was caused by negligence, the doctrine is not applicable. *Id.* at 278, 883 P.2d at 700. To invoke the doctrine of *res ipsa loquitur*, the plaintiff must present substantial evidence that (1) the injury was of the kind that ordinarily does not occur in the absence of negligence, (2) the injury was caused by an agency or instrumentality in the exclusive control of the defendant, and (3) the injury was not due to any voluntary action or contribution by the plaintiff. *Medina v. Figuered*, 3 Haw.App. 186, 188, 647 P.2d 292, 294 (1982) (citing Prosser, Law of Torts § 39 at 214 (1978)). Without even addressing the second two elements, Fry's injury was one that could have occurred without Ala Moana's negligence. *Res ipsa loquitur* is simply inapplicable.

Finally, Plaintiffs argue that Ala Moana could be negligent under a claim of general premises liability because genuine issues of material fact exist as to whether Fry was induced to the rooftop and locked outside by an employee or agent of Ala Moana. Initially, such a theory is entirely speculative; a court is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not resort to speculation. *Pioneer Mill Co.*, 90 Hawai'i at 295, 978 P.2d at 733. In addition, however, even if admissible evidence supported such a theory, Ala Moana could not be held liable for such intentional torts. "Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment." *Wong–Leong v. Hawaiian Indep. Refinery*, 76 Hawai'i 433, 438, 879 P.2d 538,

543 (1994) (citations omitted). Contrary to Plaintiffs contentions, vicarious liability would not extend to intentional torts committed by Ala Moana's employees or agents.

For all of the reasons above, Ala Moana was entitled to summary judgment on Plaintiffs' general premises liability claim.

## B. Special Duties Owed by Ala Moana

Even if Ala Moana could not be held liable on Plaintiffs' claim of general premises liability, genuine issues of material fact exist as to whether Ala Moana breached two distinct duties based on (1) its immediate control over a force to which Fry was in dangerous proximity, and (2) Fry's entry onto the property in response to Ala Moana's invitation to the public.

### 1. Duty to Control Force To Prevent Harm

■ The first of these duties was addressed in *Farrior v. Payton*, 57 Haw. 620, 562 P.2d 779. In *Farrior*, plaintiffs brought a civil action against dog owners for injuries sustained when, in an attempt to avoid a perceived attack by defendants' German shepherd dog, they fell ten feet off a natural rock wall. 57 Haw. at 625, 562 P.2d at 783–84. Citing section 338 of the Restatement (Second) of Torts, this court held that defendants owed a duty to control the dog to prevent harm to individuals on their property even if, as in the plaintiffs' case, those individuals were trespassers.[10] *Id.* at 629, 562 P.2d at 785–86.

The Restatement (Second) of Torts § 338 provides:

fendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of the injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. * * * The presumption of negligence herein considered is of course a rebuttable presumption. It imports merely that the plaintiff has made out a prima facie case which entitled him to a favorable finding unless the defendant introduces evidence to meet and offset its effect.

*Ciacci v. Woolley*, 33 Haw. 247, 257–58 (Haw. Terr.1934) (citation and internal quotation marks omitted).

10. We noted, however, "[t]he nature and extent of the [plaintiffs'] duty as landowners, as distinct from [the son's] duty as the person in charge of the dog, to persons who might intrude upon the makai portion of their property under the circumstances of this case, was not briefed or argued and we will not anticipate the question." 57 Haw. at 633, 562 P.2d at 787

§ 338. Controllable Forces Dangerous to Known Trespassers

A possessor of land who is in immediate control of a force, and knows or has reason to know of the presence of trespassers in dangerous proximity to it, is subject to liability for physical harm thereby caused to them by his failure to exercise reasonable care

(a) so to control the force as to prevent it from doing harm to them, or

(b) to give a warning which is reasonably adequate to enable them to protect themselves.

(Emphasis added.)

Ala Moana argues that *Farrior* is distinguishable because the injury in that case was caused by a moving force (i.e., a charging German shepherd dog), and this court declined to distinguish between the defendants' duty as landowners and their duty as the persons in immediate control of the animal. 57 Haw. at 633, 562 P.2d at 787. *See* Restatement (Second) of Torts § 338, comment b ("The rule stated in this Section applies to any moving force over which the possessor is in immediate control, in so far as the force is connected with a condition created or maintained by him. This is so irrespective of whether the particular force is actually set in motion by him, by a force of nature, or by a third party with or without his consent.").

We conclude, however, that the heat, smoke and gasses emanating from the stoves and through the ventilation system constituted moving forces to which Fry was in dangerous proximity and over which Ala Moana exercised immediate control. Further, as in *Farrior*, Fry's status as a trespasser on the rooftop and in the exhaust duct is irrelevant. Ala Moana employees knew of Fry's presence inside the exhaust duct, which was connected to the stoves in the Food Court, and they were in immediate control of those forces. The admissible evidence in the record creates genuine issues of material fact as to whether Ala Moana exercised reasonable care to turn off the stoves to prevent harm to Fry while she was trapped inside the duct, and whether the failure to do so was a substantial factor in causing her injuries and/or death.

Therefore, we hold that, pursuant to section 338 of the Restatement (Second) of Torts, adopted by this court in *Farrior*, as a possessor of land in immediate control of the heat, smoke, and gasses emanating from stoves in the Food Court into the exhaust duct, and knowing of Fry's presence in dangerous proximity to those forces, Ala Moana had a duty to exercise reasonable care to control those forces to prevent them from doing harm to Fry. Genuine issues of material fact exist as to: (1) whether Ala Moana breached this duty; and (2) if so, whether such breach was a substantial factor in causing Fry's injuries and/or death.

2. **Duty to Aid Based on Special Relationship**

The second duty is one which arises out of the Restatement (Second) of Torts § 314A, which provides:

§ 314A. Special Relations Giving Rise To Duty To Aid Or Protect.

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

(Emphasis added.)

▮ Generally, the law does not recognize an affirmative duty to intervene and protect another person from harm. *Lee*, 83 Hawai'i at 159, 925 P.2d at 329. Section 314A, however, recognizes a duty to aid or protect in certain circumstances. In this re-

gard, Plaintiffs assert possible liability based on subsection (4). Ala Moana did not, however, owe Fry a duty of care based on subsection (4) because Ala Moana did not voluntarily take custody of Fry. *Compare Lee,* 83 Hawai'i at 160–65, 925 P.2d at 330–35 (declining to impose duty to prevent suicide of veteran who received counseling from defendant but was not in defendant's actual custody), *with Haworth v. State,* 60 Haw. 557, 563, 592 P.2d 820, 824 (1979) (recognizing that the state owes a duty to protect a prisoner in its custody from unreasonable risk of physical harm), and *Figueroa v. State,* 61 Haw. 369, 376, 604 P.2d 1198, 1202 (1979) (recognizing that the state owes a duty to exercise reasonable care in its supervision of a juvenile committed to a detention home).

Ala Moana is, however, a possessor of land held open to the public, triggering subsection (3). If Fry entered the Center in response to Ala Moana's invitation, then Ala Moana had a duty under subsection (3) to take reasonable action to give Fry first aid after it knew that she was ill or injured, and to care for her until she could be cared for by others.

In this regard, the Third Circuit's decision in *Lundy v. Adamar of New Jersey,* 34 F.3d 1173, is instructive. In *Lundy,* the plaintiff suffered a heart attack while he was at a casino and claimed that the casino owed a duty to provide medical care. 34 F.3d at 1178–79. The Third Circuit concluded that the casino owed patrons a duty to take reasonable action to give first aid during a medical emergency. *Id.* at 1178 ("[T]he existence of a relationship between the victim and one in a position to render aid may create a duty to render assistance."). Citing commentary to section 314A, the court explained that this duty required a landowner to procure appropriate medical care as soon as the need for such care became apparent and to provide such first aid as the landowner's employees were reasonably capable of giving. *Id.* at 1179.

Considering the relationship between the owner of a shopping center and members of the public who enter the property pursuant to invitation, there are "logical, sound, and compelling reasons" for imposing a duty under these circumstances. Hao, 76 Hawai'i at 80, 869 P.2d at 219. It is not difficult to imagine situations in which a member of the public, invited to a shopping center, becomes ill or injured in an area not otherwise open to the public. For example, a young child could wander into the kitchen of a restaurant, and accidentally injure himself on a hot stove. A mentally impaired individual could wander into a construction site at a hotel, and fall through a rickety floorboard. A patron could, while having a heart attack, stagger into a restricted area. The law should not automatically absolve a shopping center owner from taking reasonable action to aid possible or actual customers based on entry into restricted areas.

■ As this court articulated in *Pickard,* "the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others." 51 Haw. at 135, 452 P.2d at 446. In elaborating on the reason for abolishing such distinctions, we explained:

> A man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without business purpose. Reasonable people do not ordinarily vary their conduct depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee, or invitee in order to determine the question whether the landowner has a duty of care, is contrary to our modern social mores and humanitarian values. The common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty.

51 Haw. at 136, 452 P.2d at 446 (citation and internal quotation marks omitted).

■ Despite Ala Moana's contentions that Fry was a trespasser, we hereby recognize the duty to aid under section 314A(3). We note that this duty to aid is distinct from the duty under Pickard toward those reasonably anticipated to be on the premises. Thus, although Fry was found in a restricted area of the Center, Ala Moana was not absolved from its duty to aid if Fry entered the

Center in response to Ala Moana's invitation to the public and subsequently became injured or ill on the property.

■ Accordingly, we hold that, pursuant to section 314A of the Restatement (Second) of Torts, as a possessor of land who held its land open to the public, Ala Moana owed members of the public who entered the Center in response to its invitation a duty to take reasonable action to give first aid after it knew or had reason to know that such persons were ill or injured, and to care for such persons until they could be cared for by others. Genuine issues of material fact exist to: (1) whether Fry was a member of the public who entered the Center in response to Ala Moana's invitation; (2) if so, whether Ala Moana breached its duties under section 314A(3); and (3) if so, whether such breach was a substantial factor in causing Fry's injuries and/or death.

### C. Good Samaritan Statutes and *Moyle* are Inapplicable

Finally, we address Ala Moana's reliance upon Good Samaritan statutes and *Moyle* to argue that it is not subject to liability based on any attempts to render aid.

First, HRS § 663–1.5(a) provides:

(a) Any person who in good faith renders emergency care, without remuneration or expectation of remuneration, at the scene of an accident or emergency to a victim of the accident or emergency shall not be liable for any civil damages resulting from the person's acts or omissions, except for such damages as may result from the person's gross negligence or wanton acts or omissions.

. . . .

Next, HRS § 663–1.6 provides:

(a) Any person at the scene of a crime who knows that a victim of the crime is suffering from serious physical harm shall obtain or attempt to obtain aid from law enforce-

ment or medical personnel if the person can do so without danger or peril to any person. Any person who violates this subsection is guilty of a petty misdemeanor. (b) Any person who provides reasonable assistance in compliance with subsection (a) shall not be liable in civil damages unless the person's acts constitute gross negligence or wanton acts or omissions, or unless the person receives or expects to receive remuneration. Nothing contained in this subsection shall alter existing law with respect to tort liability of a physician licensed to practice under the laws of this State committed in the ordinary course of the physician's practice. (c) Any person who fails to provide reasonable assistance in compliance with subsection (a) shall not be liable for any civil damages.

The circuit court granted summary judgment, in part, based on *Moyle*, 118 Hawai'i 385, 191 P.3d 1062, which addressed these statutes. The ICA declared the circuit court's ruling on this issue moot, based on its conclusion that Ala Moana did not owe Fry a duty to aid. We conclude, however, that Ala Moana is not shielded by these Good Samaritan statutes or by *Moyle*.

In *Moyle*, a patron filed suit against the owners of a night club after being assaulted and robbed by another patron in front of the club. 118 Hawai'i at 388, 191 P.3d at 1066. Citing HRS § 663–1.6, the club owners argued that they did not have an affirmative duty to aid the patron. 118 Hawai'i at 394, 191 P.3d at 1072. This court held that, pursuant to HRS § 663–1.6, the club owners could not be held liable for allegedly failing to call the police or provide medical aid upon learning of an ongoing assault.[11] *Id.* at 394, 191 P.3d at 1072. Other decisions of this court have similarly held that an individual cannot be held liable for failure to aid or protect against the criminal acts of a third party. *See, e.g., Wolsk v. State*, 68 Haw. 299, 301, 711 P.2d 1300, 1302 (1986) (citing Re-

---

11. In *Moyle*, we recognized that owners of a night club had a special-relationship duty to protect patrons (i.e., business invitees) from reasonably foreseeable criminal acts by a third party. 118 Hawai'i at 392, 191 P.3d at 1069. However, we distinguished this from a claim based upon the owners' failure to render aid and concluded that, pursuant to HRS § 663–1.6, a person who failed to provide reasonable assistance to the victim of a crime could not be held liable for civil damages. *Id.* at 394–95, 191 P.3d at 1072.

statement (Second) of Torts §§ 314A and 315, and holding that State did not have duty to warn or protect campers in state park from criminal conduct of third persons not under its control); *Kau v. City & Cnty. of Honolulu*, 6 Haw.App. 370, 374, 722 P.2d 1043, 1047 (1986) (holding that City had no duty to protect patrons of golf course from criminal acts of third parties), *Doe v. Grosvenor Props.*, 73 Haw. 158, 162–63, 829 P.2d 512, 515 (1992) (explaining that "status distinctions remain important in the decision to create exceptions to the general rule that it is unreasonable to impose a duty to anticipate and control the actions of third persons").

■ The present case, however, did not involve criminal actions by a third party. Thus, HRS § 663–1.6 and *Moyle* do not apply. Further, HRS § 663–1.5(a) absolves <u>bystanders</u> providing first aid from liability, and does not address this situation, in which Ala Moana had an affirmative duty to act.

Therefore, the Good Samaritan statutes and *Moyle* do not absolve Ala Moana of its duties.

### V. Conclusion

Based on the foregoing analysis, we affirm in part and vacate in part the ICA's judgment in favor of Ala Moana, and remand the case to the circuit court for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J.

The majority vacates the Order of the Circuit Court of the First Circuit[1] (the court) granting the summary judgment motion of Respondent/Defendant–Appellee GGP Ala Moana LLC (Ala Moana) because issues of material fact exist as to whether Ala Moana breached its duty to render aid to decedent Jasmine Fry (Fry) under Section 314A[2] of the Restatement (Second) of Torts (1965) (Second Restatement) and whether Ala Moana failed to prevent harm to Fry under Section 338[3] of the Second Restatement.

However, in my view, neither Section 314A nor Section 338 of the Second Restatement apply following this court's decision in *Pickard v. City and County of Honolulu*, 51 Haw. 134, 452 P.2d 445 (1969). Both Section 314A and Section 338 are based on the common law distinction between trespassers, licensees, and invitees. Under Section 314A, a possessor of land is under a duty to give first aid to those on his property, but only to invitees. Similarly, Section 338 sets forth a duty of care owed only to trespassers. However, in *Pickard*, this court recognized that "the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others." 51 Haw. at 135, 452 P.2d at 446.

Rather, I would hold that Ala Moana owed a duty to "use reasonable care for the safety" of Fry, *id.*, because Fry was "known to be" on Ala Moana's premises. *Kaczmarczyk v. City and County of Honolulu*, 65 Haw. 612, 615, 656 P.2d 89, 91–92 (1982) *superseded on other grounds as recognized by Bhakta v. County of Maui*, 109 Hawai'i 198, 215, 124 P.3d 943, 960 (2005). Inasmuch as an issue of material fact exists as to whether Ala Moana breached that duty, I concur in vacat-

---

1. The Honorable Gary W.B. Chang presided.

2. Second Restatement § 314A provides in relevant part as follows:

   (1) A common carrier is under a duty to its passengers to take reasonable action
   (a) to protect them against unreasonable risk of physical harm, and
   (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
   . . .
   (3) A possessor of land who holds it open to the public is <u>under a similar duty to members</u>

of the public who enter in response to his invitation.
(Emphasis added.)

3. Second Restatement § 338 provides as follows:

   A possessor of land who is in immediate control of a force, and knows or has reason to <u>know of the presence of trespassers</u> in dangerous proximity to it, is subject to liability for physical harm thereby caused to them by his failure to exercise reasonable
   (a) so to control the force as to them, or
   (b) to give a warning which is reasonably adequate to enable them to protect themselves.
   (Emphasis added.)

ing the Order of the court granting Ala Moana's motion for summary judgment.

## I.

To recount briefly, on September 3, 2005, Cary Oshiro (Oshiro), a maintenance worker at Ala Moana, discovered Fry on one of the rooftops of the shopping center between five and ten minutes after 2:00 p.m. Fry proceeded to climb onto a ventilation duct on the rooftop, and "started jumping on [it]." Eventually, the duct "collapsed enough" to allow Fry to crawl inside.

Ala Moana security officer Lukela Bagood (Bagood) arrived on the roof at approximately 2:33 p.m. and Ala Moana security officer Jowana Lobendahn (Lobendahn) arrived soon after, at approximately 2:35 p.m. At that point, Fry was already in the ventilation duct. After some communication between Fry and Lobendahn, Fry crawled through the duct system, eventually reaching a point near a restaurant called Little Café Siam (Café Siam). Oshiro attempted to find Fry by following the ventilation duct, and therefore also arrived at the restaurant, where the employees told him that the exhaust vent above the stove was moving. Oshiro eventually opened an access panel and saw Fry apparently trapped in a "hood" above the stove of Café Siam. Oshiro related that he did not think that the stoves were in use when he arrived, although he stated that "maybe" the pilot light on the stoves was on.

Lobendahn and Bagood remained on the rooftop, until they were dispatched to Café Siam approximately twenty minutes after Bagood had arrived on the rooftop. Lobendahn recounted that when she arrived, "one stove ewa of where [Fry] was located had [four] pots with hot water," and a "stove directly under [Fry] had two large cooking woks that had nothing on it." Lobendahn explained that she directed the employees to remove the cooking items and then turn off the stoves. Bagood, who arrived at approximately the same time as Lobendahn, stated that the stoves at Poi Bowl, a restaurant that

also used the exhaust duct in which Fry was trapped, were also in use at the time.

Bagood related that he was "surprised" that emergency service personnel were not present when he arrived at Café Siam, because it usually took paramedics approximately three minutes to arrive at Ala Moana after they were called. However, Ala Moana security did not call 911 until 2:54 p.m. The purpose of the 2:54 p.m. call was not to request assistance for Fry, but instead to inform the Honolulu Police Department that Fry had forced her way into the ventilation duct. At approximately 2:57 p.m., Ala Moana security called Emergency Medical Services (EMS) to request assistance in removing Fry from the duct. However, Ala Moana security then mistakenly informed EMS that Ala Moana personnel had removed Fry from the duct, and that an ambulance was not necessary. Finally, at approximately 3:00 p.m., Ala Moana security contacted the Hawai'i Fire Department (HFD) to request assistance in removing Fry from the duct. Paramedics arrived at 3:06 p.m., and HFD arrived at 3:10 p.m.

Fry was extricated from the duct at approximately 4:53 p.m. Her condition immediately deteriorated, and she was pronounced dead at Queen's Hospital at 5:33 p.m. An autopsy was performed by Dr. Kanthi De Alwis of the Department of the Medical Examiner. Dr. De Alwis concluded Fry's death was "a result of combined effects of hyperthermia[4] and respiratory compromise." She also opined that Fry had suffered an "acute psychotic episode of unknown etiology."

## II.

On May 5, 2008, Ala Moana filed a motion for summary judgement, arguing that Fry was not "owed a duty of care by Ala Moana" under *Pickard* because Fry was a trespasser and was not "reasonably anticipated" to be on the rooftop. In opposition, Petitioners/Plaintiffs–Appellants Heather R. Winfrey and Samuel F. Fry Jr., Fry's mother and father (Petitioners) argued that Fry was owed a duty under *Pickard*. Petitioners did

---

4. Hyperthermia is defined as "exceptionally high fever." *Merriam Webster's Collegiate Dictionary* 571 (10th ed. 1993).

not discuss whether Fry was "reasonably anticipated" to be on the premises.

A hearing was held on August 27, 2009. At the hearing the court "agree[d] that with respect to the *Pickard* claim, the record does not support the conclusion that it was reasonably foreseeable that the plaintiff would be in th[e] secured area." However, the court found "a residual duty to take reasonable care to provide aid to the plaintiff once her presence came to the attention of the defendants" based on *Lundy v. Adamar of New Jersey*, 34 F.3d 1173 (3d Cir.1994).[5] The court therefore issued an Order granting in part and denying in part Respondent's motion for summary judgment. However, on April 1, 2009, following Respondent's motion for reconsideration, the court issued an order granting summary judgment in favor of Respondent on all of Petitioners' claims.

### III.

On appeal to the ICA, Petitioners reiterated that Ala Moana owed Fry a duty of care under *Pickard*. Ala Moana responded that *Pickard* did not apply because Fry was an "unanticipated trespasser." Holding that *Pickard* did not apply, the ICA posited that "the dispositive question is whether the person was 'reasonably anticipated to be upon the premises[.]'" *Winfrey v. GGP Ala Moana LLC*, No. 30589, 126 Hawai'i 266, 2012 WL 456489, at *3 (Haw.App. Feb. 12, 2012) (SDO) (quoting *Pickard*, 51 Haw. at 135, 452 P.2d at 446). Because "[Petitioners] offered no evidence to indicate that Ala Moana should have 'reasonably anticipated' that Fry would be on the rooftop," the ICA concluded that *Pickard* did not apply.

### IV.

In their Application for Certiorari (Application), Petitioners maintain that they "produced evidence demonstrating that the door and gate leading to the rooftop were unlocked," and that "[Ala Moana's] only safeguard against entry onto the roof, an alarm wired to the entry door, was not operating

properly on the day of the incident." Therefore, Petitioners contend that the ICA erred in concluding that *Pickard* did not apply because Ala Moana could not have reasonably anticipated that Fry was on the rooftop.

In its Response, Ala Moana argues that the evidence demonstrates that the rooftop was secured by a locked gate and hatch, and that Ala Moana had no reason to believe that Fry would enter the roof. Further, Ala Moana asserted that it could not have "reasonably anticipated" that Fry would enter the ventilation duct, and therefore it owed no duty to Fry.

### V.

### A.

Under the common law, the duty a possessor of land owed to persons on the premises depended on the status of the individual, i.e., whether the visitor was a invitee, licensee, or trespasser. In *Pickard*, however, this court "sought to eliminate distinctions with respect to owner or occupier duty, making clear that there is only one standard of care owed by an owner or occupier of land: 'reasonable care for the safety of all persons reasonably anticipated to be upon the premises.'" *Steigman v. Outrigger Enters., Inc.*, 126 Hawai'i 133, 151, 267 P.3d 1238, 1256 (2011) (Acoba, J., concurring) (quoting *Pickard*, 51 Haw. at 135, 452 P.2d at 446) (internal brackets omitted). This court's holding was based on the recognition that "the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others." *Pickard* 51 Haw. at 135, 452 P.2d at 446. Rather, *Pickard* held that "'[a] man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without a business purpose." *Id.* at 136, 452 P.2d at 446 (internal quotation marks omitted). Additionally, "[r]easonable people do not ordinarily vary their conduct depending on such matters."

5. The Third Circuit's analysis in *Lundy* was based on Section 314A of the Second Restate-    ment. *Lundy,* 34 F.3d at 1179.

*Id.* (internal quotation marks omitted). Therefore, the common law rule was "contrary to our modern social mores and humanitarian values." *Id.* (internal quotation marks omitted). *Pickard* announced a new standard of care based on "policy considerations eschewing outdated legal classifications, affirming the value of life and limb, and crediting ordinary conduct and expectations." *Steigman,* 126 Hawai'i at 151, 267 P.3d at 1256 (Acoba, J., concurring).

### B.

This court has further clarified that under the standard set forth in *Pickard,* "an occupier of land is under a duty to exercise all reasonable care for the safety of all persons <u>known to be,</u> or reasonably anticipated to be, upon its premises." [6] *Kaczmarczyk,* 65 Haw. at 615, 656 P.2d at 91–92 (emphasis added) (citing *Pickard,* 51 Haw. at 135, 452 P.2d at 446). Under that standard, summary judgment was inappropriate because a genuine issue of material fact existed as to whether Ala Moana exercised reasonable care for the safety of Fry once it became aware that Fry was trapped in the ventilation duct. *See French v. Hawai'i Pizza Hut,* 105 Hawai'i 462, 470–71, 99 P.3d 1046, 1054–55 (2004) (explaining that on a motion for summary judgment, the moving party must demonstrate "the absence of any genuine issue of material fact" after "constru[ing] the evidence in the light most favorable to the non-moving party").

First, after Fry crawled into the ventilation duct, Oshiro followed the duct and found Fry trapped above Café Siam. At that point, Ala Moana owed Fry a "duty of reasonable care" inasmuch as Fry was "known to be" on the premises. *Kaczmarczyk,* 65 Haw. at 615, 656 P.2d at 92.

Second, both Lobendahn and Bagood testified that the stoves below the ventilation duct were still active approximately twenty minutes after Ala Moana employees became aware of Fry's presence in the ventilation duct. Additionally, the record indicates that Ala Moana did not call 911 to request medical assistance until well after Ala Moana security was aware that Fry was trapped in the duct. Hence, a genuine issue of material fact exists, *inter alia,* as to whether Ala Moana "exercised reasonable care for the safety of [Fry]," *Kaczmarczyk,* 65 Haw. at 615, 656 P.2d at 91–92, inasmuch as that duty could be breached by subjecting Fry to the heat emanating into the vents from the stoves, or by failing to take steps to prevent harm to Fry once her proximity to the stoves became known.[7] Hence, both the court and the ICA erred in concluding that Ala Moana owed no duty to Fry.

### VI.

The majority contends that *Pickard* does not apply because Ala Moana could not have "reasonably anticipated" Fry's presence in the ventilation duct. Majority opinion at 272–73, 308 P.3d at 901–02. However, as explained *supra,* the duty of reasonable care under *Pickard* also applies once it was "known" to Ala Moana that Fry was present in the ventilation duct. *Kaczmarczyk,* 65 Haw. at 615, 656 P.2d at 91–92. This conclusion is coincident with the common law which preceded *Pickard,* inasmuch as under the

---

**6.** In *Kaczmarczyk,* the decedent drowned at Ehukai Beach Park on Oahu despite the efforts of a city lifeguard to save him. 65 Haw. at 613, 656 P.2d at 91. This court concluded that the city "had a duty to warn users of Ehukai Beach Park of extremely dangerous conditions in the ocean along its beach frontage which were not known or obvious to persons of ordinary intelligence." *Id.* at 615, 656 P.2d at 92. This court held that "[t]he plaintiffs ... were [ ] entitled to present to the trier of fact the question of whether City was negligent in failing to warn [the] decedent." *Id.* The City's duty to warn beach users of extremely dangerous conditions was later limited by statute to public beach parks. *Bhakta,* 109 Hawai'i at 215, 124 P.3d at 960.

**7.** I agree with the majority that neither the Good Samaritan Statutes nor *Moyle v. Y & Y Hyup Shin Corporation,* 118 Hawai'i 385, 191 P.3d 1062 (2008), render Ala Moana immune from liability. As explained by the majority, Hawai'i Revised Statutes (HRS) § 663–1.5(a) "absolves <u>bystanders</u> providing first aid from liability," but does not apply here, where Ala Moana owed a duty of care to Fry. Majority opinion at 277, 308 P.3d at 906. (Emphasis added.) Moreover, HRS § 663–1.6 and *Moyle* both involved criminal actions by a third party, and are therefore inapplicable. Majority opinion at 277, 307 P.3d at 906.

common law rule an occupier of land owed a duty to all persons, even trespassers, to carry on his or her activities with reasonable care for their safety once he or she became aware of their presence.[8] *See* Second Restatement § 336.

*Pickard* did not repudiate the common law duty of reasonable care a landowner owed to those known to be on the premises. *Kaczmarczyk*, 65 Haw. at 615, 656 P.2d at 91–92. Because *Pickard* focused on <u>expanding</u> the duty of care owed by occupiers of land, this court clearly did not intend to <u>eliminate</u> the common law duty owed to those whose presence are known to a landowner. Hence, as established in *Kaczmarczyk*, the duty of reasonable care announced in *Pickard* applies to those <u>known</u> to be on the premises, in addition to those "reasonably anticipated" to be on the premises.

## VII.

The majority instead concludes Ala Moana owed a duty to protect Fry under *Farrior v. Payton*, 57 Haw. 620, 562 P.2d 779 (1977). In *Farrior*, however, this court merely cited Section 338 of the Second Restatement and *Pickard* without analysis, for the proposition that a duty of care was owed to those reasonably anticipated upon the premises. Under the facts in *Farrior*, such trespassers were reasonably anticipated to enter the premises. *Farrior*, 57 Haw. at 629, 562 P.2d at 786. The citation in *Farrior* of both Section 338 and *Pickard* without comment can only be viewed as illustrating that Section 338, pertaining only to trespassers, was subsumed in *Pickard*'s inclusive duty of care. Thus, Section 338 was not "adopted by this court in *Farrior* [.]" Majority opinion at 274, 308 P.3d at 903.

8. Second Restatement § 336 provides for a similar duty with respect to trespassers:
A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the <u>possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety.</u>
(Emphases added.)
Second Restatement § 341 provides for a similar duty with respect to licensees:

Respectfully, in my view Section 338 is inconsistent with *Pickard*. Under the Second Restatement, "a possessor of land is not liable to trespassers for physical harm caused by his failure to exercise reasonable care," except "as stated in, [*inter alia*, Section 338]." Second Restatement § 333. Section 338 provides that a possessor of land owes a duty if he "knows or has reason to know of the presence of <u>trespassers</u>" who may be endangered by a force a possessor of land is "in immediate control of." Second Restatement § 338. Thus, Section 338 effectuates the common law's rigid differentiation between the duties owed to invitees, licensees, and trespassers, inasmuch as it provides a specific duty that is owed <u>only</u> to trespassers.

However, to reiterate, *Pickard* abolished the common law distinctions between classes of persons because a person's life or limb was not "less worthy of protection" because he or she was a licensee or trespasser. 51 Haw. at 135, 452 P.2d at 446. *Pickard* recognized that it was "contrary to our ... humanitarian values" to differentiate the standard of care owed to those on the premises based on their status. *Id.* at 136, 452 P.2d at 446. Hence, inasmuch as the duty announced in Section 338 of the Second Restatement is limited to trespassers, it is inconsistent with *Pickard*.

## VIII.

The majority also concludes that Ala Moana owed Fry a duty under Section 314A(3) of the Second Restatement. Respectfully, Section 314A(3) also conflicts with *Pickard*'s rationale. Under Section 314A of the Second Restatement, a possessor of land owes a duty to "protect [certain persons] against unreasonable risk of physical harm" and to "give them first aid after [he or she] knows ...

A possessor of land is <u>subject to liability to his licensees for physical harm caused to them by his failure to carry on his activities with reasonable care for their safety</u> if, but only if,
(a) he should expect that they will not discover or realize the danger, and
(b) they do not know or have reason to know of the possessor's activities and of the risk involved.
(Emphasis added.)

**282**

that they are ill or injured." That duty is based upon a "special relationship" with the person protected. Section 314A(3) declines to extend the same protection to others.

The majority indicates Section 314A(3) states that possessors of land owe a duty " 'to members of the public who enter in response to his [or her] invitation.' " Majority opinion at 274, 308 P.3d at 903 (quoting Second Restatement § 314A). The same provision was discussed in *Doe v. Grosvenor Props. (Hawai'i) Ltd.*, 73 Haw. 158, 829 P.2d 512 (1992). Referring to Section 314A(3), this court stated that "[Section 314A(3) ] describes the relationship between a possessor of land and his invitee" and observed that:

> The [Second Restatement] § 332 states:
> (1) An invitee is either a public invitee or a business visitor.
> (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
> (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.[9]

*Doe*, 73 Haw. at 163–64, 829 P.2d at 515–16 (emphasis added). This court rejected the public invitee definition in the Second Restatement, holding that "where the definition of an invitee is relevant solely to determine the scope of [Second] Restatement [Section] 314A(3), we decline to adopt the broader, public invitee definition, finding that there is no basis upon which to base a duty to protect

where a landholder holds open his land gratuitously, and does not receive or hope to receive monetary, commercial, or other tangible benefit from the invitation." *Id.* at 164, 829 P.2d at 516 (emphasis added).[10] *Pickard* established that the duty owed by an occupier of land does not vary based on the reason that other persons have come upon his or her land, *Pickard*, 51 Haw. at 136, 452 P.2d at 446, and the limitation of a "special relationship" in Section 314A(3) would diminish the scope of the *Pickard* rule.

### IX.

Based on the foregoing, I respectfully concur and dissent.

---

**9.** Under the Second Restatement, a "business visitor," is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Doe*, 73 Haw. at 164, 829 P.2d at 515–516 (quoting Second Restatement § 332). Business invitees include "persons who are invited to come on the land for a purpose connected with the business for which the land is held open to the public." Second Restatement § 332 cmt. e. Thus, persons entering a shop are business invitees if they enter to make a purchase or to look at goods on display . *Id.*

**10.** Further, the majority expands the coverage of Section 314A beyond that contemplated by the Second Restatement. The duty owed by a possessor of land under Section 314A does not ex-

tend "to one who has ceased to be an invitee." Second Restatement § 314A cmt. c. A "visitor has the status of an invitee only while he is on the part of the land to which his invitation extends." Second Restatement § 332 cmt. l. When an invitee leaves the area of his invitation, he ceases to become an invitee and generally becomes a trespasser. *See id.*

However, the majority states that "[t]he law should not automatically absolve a shopping center owner from taking any action to aid possible or actual customers." Majority opinion at 275, 308 P.3d at 904. Therefore, the majority concludes that "[d]espite Ala Moana's contentions that Fry was a trespasser, we hereby recognize a duty to aid under Section 314A(3)." *Id.* at 275, 308 P.3d at 904. This approach would seem inconsistent with Section 314A(3).